[No. S031423. Mar. 6, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
GREGORY ALLEN STURM, Defendant and Appellant.

## COUNSEL

Lynne S. Coffin and Michael J. Hersek, State Public Defenders, and John Fresquez, Deputy State Public Defender, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, William M. Wood and Karl T. Terp, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MORENO, J.**—A jury convicted defendant Gregory Allen Sturm of the first degree murders of Darrell Esgar, Chad Chadwick, and Russell Williams (Pen. Code, § 187),[1] among other offenses, and found true the special circumstance allegations that defendant committed multiple murders (§ 190.2, subd. (a)(3)) and that each murder was committed during the commission of a robbery (§§ 190.2, subd. (a)(17)(i), 211). After a penalty phase mistrial, a second jury determined that the death penalty should be imposed. This appeal from the resulting judgment is automatic. (§ 1239, subd. (b).) For the reasons that follow, we affirm defendant's convictions, but reverse the death sentence.

## I. FACTS

### A. *Procedural History*

On April 15, 1992, the Orange County District Attorney filed an eight-count first amended information charging defendant with three counts of first degree murder (of Darrell Esgar, Chad Chadwick and Russell Williams, respectively) in violation of section 187, one count of burglary in violation of section 459, three counts of robbery (of Esgar, Chadwick and Williams, respectively) in violation of section 211, and one count of attempted escape by a prisoner in violation of section 4532, subdivision (b).

It was further alleged that defendant personally used a firearm in the commission of the murders and robberies in violation of section 12022.5, that defendant committed the murders while in the commission of second degree burglary and robbery in violation of sections 190.2, subdivision (a)(17)(vii) and (i), 211, and 460, and that defendant committed multiple first degree murders in violation of section 190.2, subdivision (a)(3).

---

[1] All further undesignated statutory references are to the Penal Code.

Defendant pled guilty to the attempted escape charge and not guilty to the remaining charges. On May 8, 1992, the jury returned guilty verdicts on all counts and found true the weapon-use allegation and all special circumstance allegations. The jury did not return a verdict finding whether defendant committed premeditated and deliberate first degree murder. The penalty phase of the trial commenced, but on June 10, 1992, the jury announced it could not reach a penalty verdict, and the court declared a mistrial. A poll of the jury indicated that the jurors were split 10 to 2, with the majority favoring a sentence of life without the possibility of parole.

A second penalty phase jury trial began on October 20, 1992. On November 23, 1992, the jury determined that the death penalty should be imposed. The trial court sentenced defendant to death for the murders, and imposed a two-year sentence for the attempted escape and a four-year penalty enhancement for the use of a firearm during the murder of Esgar. Pursuant to section 654, the court stayed the remaining weapon-use enhancement related to the robbery counts and the other murder counts, pending the death sentence being carried out. This appeal is automatic.

B. *Guilt Phase Evidence*

1. *Prosecution Evidence*

On August 20, 1990, police officers discovered the bodies of employees Darrell Esgar, Chad Chadwick and Russell Williams in the Super Shops automotive store in Tustin, California. It was later determined that $1,103.56 had been stolen from the store.

An autopsy revealed that Chadwick had a defensive bullet entry wound on the palm of his left hand, and a reentry wound in the right side of his head. Williams had two gunshot wounds to his head and had bite marks on his tongue, which indicated that he had bitten his tongue before he was shot. Esgar had one gunshot wound to the left side of his head.

After hearing about the murders, Laurie Stevenson called her friend John Orr, a reserve police officer for the Garden Grove Police Department, informing him that her roommate, Rick LaBare, had loaned defendant two guns the day before the bodies were discovered. Orr telephoned the Tustin police with the information.

LaBare, a former salesman at Super Shops, was friendly with defendant, and they used cocaine together quite often. Defendant had worked at Super Shops until August of 1990; his behavior at work had been rather erratic, and he had been chronically tardy.

On August 19, 1990, LaBare had loaned defendant a .38-caliber revolver and a shotgun. Defendant had told LaBare that he wanted to borrow the guns to go shooting in the desert near Barstow. That same day, Robert Paleno, who was advertising his motorcycle for sale for $5,000, received a phone call from defendant regarding the motorcycle. While looking at the motorcycle, defendant mentioned that he worked at Super Shops. He later told Paleno that he would be back that evening with cash to purchase the motorcycle.

The day the three victims' bodies were discovered, LaBare asked defendant to return the guns and defendant promptly complied. LaBare then contacted the Tustin police, expressing concern that defendant was involved in the Super Shops murders, and voluntarily gave the guns to the police. Ballistics tests revealed that the revolver defendant borrowed from LaBare was the murder weapon.

Police first interviewed defendant on August 21, 1990. He denied having any involvement in either the murders or the robbery, but did admit that he had gone to Super Shops that day. Defendant was not placed under arrest at that time.

Tustin Police Officer Nancy Rizzo executed a warrant to search the apartment where defendant lived and police officers found a gold T-shirt and a pair of shorts that both had blood on them. Subsequent tests determined that the blood could only have come from Esgar. In addition, a bill from a jewelry store with defendant's address on it was found at the crime scene.

On August 23, 1990, defendant climbed over the fence of Randy Dusseau's yard in Riverside. Dusseau saw him and asked John Hauver, one of several tree trimmers working at that property, to pursue defendant. Hauver chased defendant on foot for more than two hours, and finally found him hiding underneath a trailer. Hauver stayed with defendant until the police arrived. While under the trailer, defendant began crying and told Hauver that he had not committed the murders. Hauver had not mentioned the murders.

Following his arrest, defendant gave a videotaped interview and "walk-through" of the crimes. At first, defendant attempted to implicate a Mexican drug dealer named "John Davis" in the murders, claiming that Davis had committed the robbery and that defendant had assisted him in exchange for cocaine. However, after police indicated that they did not believe defendant's version of events, defendant confessed to committing the robberies and murders.

In an interview with Detective Nasario Solis, defendant indicated that, on the night of the murders, he had stayed in the Super Shops after closing, telling his friends working there that he wanted to buy some car parts. He then pulled out a gun, but the victims did not think he was being serious. After he made the three victims open the safe in the back of the store, defendant became scared and made Esgar use tape to bind the hands and feet of the other two victims, and then bind his own hands.

Defendant turned to leave, and his gun went off. He returned to where the three victims were, and Chadwick told him it was "not too late." Defendant shot Chadwick. Esgar started crying and said: "Oh, my God." Defendant then shot Williams. Esgar repeated the phrase, "oh, my God" with his head down, and defendant shot him. Defendant walked away, grabbed the money out of an open cash register, and rode away on his bicycle.

On November 29, 1990, after his arrest, defendant was transferred to Western Medical Center in Anaheim to have his ankle X-rayed. Defendant required a wheelchair to get around the hospital. At one point, defendant said to one of the transporting deputies: "Guess I won't try to escape because you will probably shoot me." After having a half cast put on his leg, defendant was required to use crutches. While at the hospital, defendant attempted to escape by throwing away his crutches and running outside the building, where he was apprehended.

### 2. *Defense Evidence*

During the opening and closing statements of the guilt phase trial, defense counsel conceded that defendant killed the victims, but argued that defendant was guilty of first degree felony murder and was not guilty of premeditated and deliberate murder. The focus of the defense case was to provide evidence of defendant's cocaine addiction, in order to show that his prolonged drug use had affected his ability to premeditate the crimes. Defendant did not testify on his own behalf.

Randy Pettit, one of the tree trimmers present when defendant was apprehended three days after the victims' bodies were found, testified that defendant exhibited symptoms of a person "coming down" from drugs. Pettit was able to identify the symptoms, which included defendant engaging in disjointed conversation and staring into space, because he was a former drug addict.

A deputy sheriff present at the hospital when defendant attempted to escape from custody testified that, after defendant was apprehended, defendant expressed disappointment that he had not been shot.

A manager of the Super Shops store, Courtney Maxwell, had socialized with defendant outside of work. Maxwell had occasionally overheard conversations between defendant and another Super Shops employee about using cocaine. Maxwell also had observed defendant in the parking lot of the Garden Grove Super Shops store with a bag of what appeared to be white powder. In Maxwell's opinion, defendant had a drug problem.

Defense counsel also elicited testimony from Larry Stein, Ph.D., chairman of the Department of Pharmacology at the University of California at Irvine College of Medicine, as to how stimulants such as cocaine affect the brain and behavior. According to Dr. Stein, cocaine initially produces positive feelings in a user. However, chronic cocaine use greatly increases a user's anxiety level, and results in heightened focus on obtaining and using cocaine. Dr. Stein further testified that chronic stimulant use also may predispose a user to commit violent acts, including homicide.

### C. *Penalty Phase Evidence*

#### 1. *Prosecution Evidence*

Because the second penalty phase jury had not been present at the guilt phase, the prosecution introduced evidence of the underlying crimes, including a description of the crime scene, the autopsies of the victims, and ballistics analysis. The prosecution also presented evidence of defendant's cocaine use similar to that introduced in the guilt phase, evidence of defendant's attempt to purchase a motorcycle, interviews given to police by defendant, and testimony by defendant's former supervisor.

The prosecution also presented seven victim-impact witnesses: Sharon Chadwick (Chad Chadwick's mother), Leslie McLeod (Chad Chadwick's girlfriend), Clayton Esgar (Darrell Esgar's father), Gina Whitmeyer (Darrell Esgar's girlfriend), Linda Esgar (Darrell Esgar's mother), Grace West (Russell Williams's grandmother), and Melinda Williams (Russell Williams's mother). The victim-impact witnesses largely testified to the emotional impact that the victims' death had upon them, and described the positive personal characteristics of each victim.

## 2. *Defense Case*

Numerous witnesses, including friends, neighbors, and teachers, testified on defendant's behalf that he was well liked, was considered to be a helpful person and a good worker, and was like family to many people. A family friend and neighbor, who felt that defendant had been unhappy at home, had considered adopting defendant. Many witnesses testified that they would be devastated if he were given the death penalty.

Witnesses also testified that defendant had been on the cheerleading squad in high school, and that he was supportive, friendly, helpful, and well liked by the other cheerleaders. The coach of the cheerleading squad testified that defendant, who was always polite and cooperative, had been a pleasure to have on the squad.

Defendant's kindergarten teacher, Laura Kennelly, testified that defendant had been immature and ill prepared for kindergarten. Defendant was not ready for academic work, and was often unkempt. Although she had recommended to defendant's mother that he be held back, defendant had been advanced anyway.

Sam Ruiz, who had been defendant's Little League coach when defendant was 13 to 15 years old, testified that defendant became angry with himself when he made a mistake, and was often overly self-critical. Ruiz visited defendant's home to speak with defendant's mother about this behavior, but the conversation had been interrupted by defendant's mother's boyfriend, Tom Sturm, who became very angry at defendant.

Several witnesses also described the mistreatment of defendant by Tom Sturm. Tom Sturm was not affectionate to defendant, and frequently cursed at him and called him names, beginning when defendant was a young child. Witnesses also testified to seeing Tom Sturm hit defendant. Tom Sturm rarely participated in holiday celebrations, and defendant's older sister, Heidi Sturm, could not remember him ever buying a Christmas present for defendant.

Heidi Sturm testified at length. Tom Sturm often yelled at defendant, and began hitting defendant when he was a toddler. He often restricted defendant to his room for two- to five-day periods, and only allowed defendant to leave to eat and to use the bathroom; this occurred when defendant was three or four years old. Tom Sturm spanked defendant on a near-daily basis, hitting him with pieces of wood, a belt, fishing poles, and a paddle that had been made for the purpose of spanking defendant and his siblings.

Heidi Sturm also testified that when she was 15 years old, defendant saw Tom Sturm touching her breasts and putting his hand down her pants. Heidi Sturm had a good relationship with defendant, who protected her once when she was being threatened by several males. She further testified that she would feel empty were her brother to be given the death penalty.

Della Garrett, defendant's grandmother, also testified about defendant's relationship with Tom Sturm. She had never seen Tom Sturm display any affection toward defendant, and had seen defendant confined to his room. Tom Sturm told Della Garrett that she and her husband were not welcome in his house, and that she was not to buy gifts for the children. Defendant, as well as the rest of the Sturm family, acted differently when Tom Sturm was at home than when he was not present. Della Garrett testified that were defendant to be given the death penalty, she would feel as if she had lost everything. Irridell Garrett, defendant's grandfather, testified that he loved defendant and would be very hurt were defendant to be given the death penalty.

Errol Medeiros, defendant's biological father, testified that when he and defendant's mother separated, he did not know that she was pregnant with defendant. Errol Medeiros moved to Virginia in 1970, and did not have any contact with defendant until 1985, when defendant's mother called him to ask if defendant could live with him in Virginia. Defendant had been kicked out of the house, and Errol Medeiros was happy to have defendant move in with him. Defendant got along well with Errol Medeiros's other sons, and formed close relationships with them.

Cindy Medeiros, Errol's wife, also testified about the period when defendant lived with them in Virginia, noting that defendant did his chores well. She stayed in touch with defendant, and said that she would feel like she lost a son if defendant were to be sentenced to death.

Cathy Mickey met defendant when he was 13 years old through Little League baseball; her husband was president of the league. Several years later, defendant moved into the Mickeys' house. He had been living in his car prior to that. Defendant lived with the Mickeys for four or five months. He did work around the house, and caused no trouble while he lived there. David Mickey also testified that defendant caused no trouble at the house, and did many voluntary chores. Defendant also umpired Little League games for free, and was a good umpire.

Several witnesses testified that defendant used cocaine in 1989 and 1990. Courtney Maxwell testified that he saw defendant under the influence of cocaine three or four times, and had seen him with a bag of white powder. Rick LaBare testified that he used cocaine with defendant two or more times a week for a few months, and that defendant appeared to use a growing amount, increasing his use from four to five lines of cocaine per night to more than seven lines of cocaine per night in August 1990. According to another witness, defendant used large amounts of cocaine as early as 5:00 a.m. and even when police officers were near.

Deputy Sheriff Sheldon Berg testified that on November 30, 1990, defendant tried to escape from custody. Berg chased and tackled defendant, who told Berg that he wished officers had shot him. Susan Webster, a registered nurse at the Orange County jail, testified that defendant had expressed some desire to kill himself, and that she recommended that defendant be placed in the mental health ward because he was depressed and suicidal. Defendant expressed remorse for the crimes that he had committed.

Deputy Sheriff David Albert testified that defendant volunteered to help with cleaning duties when he was in county jail awaiting trial, and never caused trouble with other inmates and deputies. Deputy Sheriff John Sprague met defendant when defendant was in isolation because of his escape attempt. Sprague spoke with defendant for a while because defendant was crying and was very upset; defendant expressed remorse for his crimes. During the six months Sprague was assigned to defendant's module, defendant never gave him any trouble or caused any trouble with other inmates. The head of the Prison Ministry at Calvary Chapel Church testified that he had monthly meetings with defendant, and that defendant expressed remorse and repentance for his crimes, and cried when they spoke about the crimes.

Dr. Larry Stein, the chairman of the Department of Pharmacology at the College of Medicine at University of California at Irvine, testified at length about the general effects of cocaine abuse. Dr. Stein based his testimony on animal studies. He explained that cocaine overstimulates the movement, sensory, and aggression systems of the body, and that such overstimulation predisposes the cocaine user to violence.

In addition, Dr. Stein explained that the positive feelings of early cocaine use are replaced in the chronic cocaine user by anxiety, extreme euphoria, and

a total disregard for anything but obtaining cocaine. Severe cocaine abuse acutely impairs a person's ability to judge the consequences of his actions, and also lowers impulse control. Although addiction to cocaine may lead addicts to lose their jobs, families, and health, the need for cocaine is so great that addicts often ignore these negative consequences. A person who stops taking cocaine goes through a "crash phase" in which he or she experiences depression, fatigue, sleepiness, and extreme hunger.

Dr. Susan Fossum, a clinical psychologist, performed a social history of the Sturm family based upon interviews with defendant, Linda Sturm, Heidi Sturm, other family members, and neighbors, and her review of records related to the family. In her opinion, defendant's family constituted a "malignant family system," which, as defined by Dr. Fossum, is much worse than a dysfunctional family; malignancy often involves criminal activities within the family and may involve life-threatening situations for the family members, especially for developing children.

Dr. Fossum opined that, in a malignant family system, there is usually an "identified problem," a person whom the parents usually blame for the family's difficulties. Defendant was the "identified problem" in the Sturm household, and therefore when Tom Sturm attempted to dominate the household with violence, most of his anger was directed at defendant.

In addition, Dr. Fossum testified that "shifting coalitions," in which a parent sometimes sides with one of the children and at other times sides with the other parent, occurred in the Sturm family, giving the children mixed messages as to whether Tom Sturm's violent behavior was acceptable. Also, because the Sturm children mistakenly believed that Tom Sturm was married to their mother, his status as their "stepfather" gave his actions greater authority. In trying to convince defendant that the abuse by Tom Sturm was his own fault, Linda Sturm distorted defendant's sense of reality.

On the basis of her interviews and the tests administered on defendant, Dr. Fossum diagnosed him as follows: between the ages of six and 13, defendant suffered from chronic childhood depression, developmental reading disorder, developmental writing disorder, and undifferentiated attention deficit disorder. Defendant was first exposed to drugs when he was 13 or 14 years old, and was dependent upon cocaine between the ages of 14 and 18 years.

Between the ages of 18 and 20 years, defendant had recurrent major depression and continued cocaine dependence; additionally, defendant had borderline personality disorder. In Dr. Fossum's opinion, defendant began taking cocaine to medicate the ongoing depression that had originated when he was a small child.

## II.  DISCUSSION

All of defendant's claims relate to the validity of his death sentence; he does not contest his convictions for the murders and related crimes. Accordingly, we affirm defendant's convictions.

Defendant asserts that numerous instances of reversible error occurred at his penalty phase trial, including judicial misconduct. After examining the unique facts of this case, we agree that the trial judge made inaccurate statements that prejudiced defendant and committed misconduct by persistently making inappropriate and disparaging comments directed toward defense counsel and defense expert witnesses during the second penalty phase trial, and that these errors require reversal of the death sentence. Our conclusion makes it unnecessary to address defendant's other claims.

Defendant claims that the trial judge: (1) led the jury to believe erroneously that defendant had been convicted of willful, premeditated, and deliberate murder; (2) belittled crucial defense expert witnesses and hamstrung their testimony; and (3) repeatedly disparaged defense counsel, to the extent that the trial judge gave the jury the impression that he was aligned with the prosecution. Defendant seeks reversal of the penalty verdict due to the asserted prejudice he suffered from the cumulative effect of these errors.

We agree with defendant that, taken together, it is reasonably probable that the combined effect of these errors had a prejudicial effect on the penalty phase. While some of the judge's remarks were innocuous, and while we disagree with certain of defendant's challenges to evidentiary rulings, the trial judge made comments in front of the jury that constituted misconduct at several crucial instances. These errors were sufficiently severe and pervasive that it was reasonably probable that the errors affected the jury's deliberations, to defendant's detriment.

### A.  *Comment That Premeditation Was a "Gimme"*

In his initial comments to the panel of prospective jurors for the second penalty phase trial, the trial judge generally explained the procedure for a penalty phase trial, and outlined the jury's responsibilities. In attempting to explain to the prospective jurors the importance of special circumstances in a

penalty phase trial, the trial court noted that not all persons convicted of first degree murder are eligible for death: "If you say fine, first degree and I would go ahead and automatically in every case basically if the first degree killing if it's premeditated, deliberate—*and that's a gimme here*. If you feel that way and you feel the death penalty should be imposed, even without the special circumstances, let us know." (Italics added.) Later, while questioning Prospective Juror Christine S. about her juror questionnaire, the trial judge stated that: "You indicate, I believe[] in the death penalty when it was premeditated murder, *that is a gimme. This is premeditated, all over and done with*, so you are in the penalty phase. Do you understand where we are headed?" (Italics added.)

After this latter comment, defense counsel objected and moved for a mistrial on the ground that the judge had made an incorrect statement, and had tainted the panel by implying that defendant had been convicted of premeditated murder when he had not, in fact, been so convicted. The trial court denied defendant's motion for a mistrial, and also declined to instruct the jury, as defense counsel requested, that defendant had not been "convicted of first degree murder based upon premeditation and deliberation," noting that such an instruction would be "giving a boost to the defense," and that he was not "going to get into felony murder, premeditated, to this jury" because "[i]t would only confuse them."

Defendant contends that the trial judge's comments in the presence of the panel were inaccurate because defendant's conviction contained no explicit finding on the issue of premeditated murder. The People concede that, at the guilt phase, the jury did not return a verdict finding defendant to have committed premeditated and deliberate first degree murder. At the guilt phase, the jury was given special verdict forms as to two different theories of first degree murder: felony murder and premeditated murder. The jury returned a finding that defendant had committed felony murder, but left the premeditated murder verdict form blank, indicating that the guilt phase jury based the first degree murder finding on a theory of felony murder.

The People, however, contend that the trial court's comments were not directly related to the particulars of defendant's trial, but were instead attempts by the court to illustrate that a guilty verdict as to first degree murder was, in itself, insufficient to make defendant eligible for the death penalty, and that a verdict finding true a special circumstance was necessary to render defendant eligible for the death penalty. We reject the People's defense of these improper comments. Neither of the trial judge's comments specified that he was speaking in hypothetical terms. Rather, his statements linked the finding of premeditation to the instant case; his statement that "[t]his

is premeditated, all over and done with" (italics added) indicated that the reference to premeditation was more than merely hypothetical, but was related to the particular case at bar.

The trial judge's comments regarding premeditation are especially troubling, given that a lack of premeditation was a central theory supporting the defense case in mitigation. Here, the guilt phase jury was unable to reach a decision on the question of whether the murders were premeditated, yet the trial judge's presentation of the issue as being "over and done with" effectively removed the issue of premeditation, or lack thereof, from the jury's consideration at the second penalty phase trial. Although the trial judge could have allayed the damage done to the defense case by advising the venire panel to disregard his comments, he declined to do so in order to avoid giving a "boost" to the defense, and never advised the jury that his comments were inaccurate.[2]

■ A trial court may comment on the evidence (Cal. Const., art. VI, § 10), but such comments "must be accurate, temperate, nonargumentative, and scrupulously fair." (*People v. Rodriguez* (1986) 42 Cal.3d 730, 766 [230 Cal.Rptr. 667, 726 P.2d 113].) This requirement applies to judicial comments made during jury selection. (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1217–1218 [120 Cal.Rptr.2d 477, 47 P.3d 262].) The trial judge's comments regarding premeditation were factually inaccurate and severely damaged the defense penalty phase strategy of avoiding a jury finding of premeditation and deliberation at the guilt phase, and of arguing at the penalty phase that defendant's lack of premeditation and deliberation was a mitigating factor. The trial judge's comments undermined this defense strategy. Indeed, the trial judge's comments during voir dire, left uncorrected, bolstered the prosecutor's argument later in the trial that defendant had premeditated the murders and undercut defendant's arguments that the murders were not premeditated and were committed under the influence of drugs. Consequently, we hold that the trial judge erred in telling the jury that premeditation was a "gimme" and that the issue of premeditation was "all over and done with."

---

[2] The dissent states that "the majority ignores subsequent steps taken by the trial court to ensure no impropriety or confusion occurred," namely that the trial court advised the prospective jurors to " 'disregard[] the court's comment [about premeditation] before.' " (Dis. opn., *post*, at p. 1246.) The trial court's disclaimer, however, was insufficient to mitigate the effect of his comments that premeditation was a "gimme" because he did not tell the jury, as defendant requested, that his prior comments were inaccurate. Indeed, as the trial judge's clarification occurred only after his *second* comment that premeditation was a "gimme," it is quite unlikely that his direction to generally disregard his prior comment regarding premeditation substantially allayed defendant's concerns.

### B. *Judicial Misconduct*

Defendant contends that the trial judge belittled crucial defense witnesses and hamstrung their testimony and repeatedly disparaged defense counsel, giving the impression that the court was aligned with the prosecution.

A "trial court commits misconduct if it persistently makes discourteous and disparaging remarks to defense counsel so as to discredit the defense or create the impression that it is allying itself with the prosecution." (*People v. Carpenter* (1997) 15 Cal.4th 312, 353 [63 Cal.Rptr.2d 1, 935 P.2d 708]; see also *People v. Fudge* (1994) 7 Cal.4th 1075, 1107 [31 Cal.Rptr.2d 321, 875 P.2d 36]; *People v. Clark* (1992) 3 Cal.4th 41, 143 [10 Cal.Rptr.2d 554, 833 P.2d 561].) Jurors rely with great confidence on the fairness of judges, and upon the correctness of their views expressed during trials. (*People v. Mahoney* (1927) 201 Cal. 618, 626–627 [258 P. 607].) When "the trial court persists in making discourteous and disparaging remarks to a defendant's counsel and witnesses and utters frequent comment from which the jury may plainly perceive that the testimony of the witnesses is not believed by the judge . . . it has transcended so far beyond the pale of judicial fairness as to render a new trial necessary." (*Id.* at p. 627.)

The trial judge in the present case belittled defense witnesses on several occasions. Dr. Stein, an expert in pharmacology called by the defense to testify as to the general effects of cocaine abuse, testified that he received about $4 million worth of federal grants over his 13 years with the University of California. The trial judge interjected the comment, "[i]n other words, you contributed to the federal deficit; is that correct?" Later, Dr. Stein was asked by defense counsel how he drew conclusions about the effects of drugs on people, given that he had only participated in animal studies. Dr. Stein attempted to answer the question, stating "The reason that the federal government puts millions of dollars . . ." but was cut off by the trial judge, who told him to "[t]ry and answer the question. Not whether the federal government spent millions of dollars. They spent too much already. Let's not get into that . . . . That would be very depressing and we will need cocaine." This statement appears to refer to evidence presented by the defense that some individuals use cocaine to self-medicate themselves as treatment for depression.

Defense counsel asked Dr. Fossum, a clinical psychologist who performed a social history of the Sturm family and testified for the defense as to the family dynamic that existed in the Sturm household during defendant's childhood, to point out some examples of particular pathological behaviors in the Sturm family. Dr. Fossum responded that she "could cite to the rather constant message that Gregory Sturm got . . . ." The prosecutor did not object, but the trial judge cut off Dr. Fossum's response and admonished

Dr. Fossum for overusing descriptive words in her testimony: "No, don't. You have a tendency to add to your testimony. Give us an example. Don't give a lot of adjectives and adverbs and so forth . . . . Just tell us what your answer is and then leave it up to the people that are determining the factual situation to make the necessary adjectives if they desire." Shortly thereafter, the trial judge sua sponte struck an answer by Dr. Fossum, telling her that "you embellish your answers, ma'am, which causes a problem for the court."

Later, defense counsel asked Dr. Fossum whether she could see signs of defendant's depression by examining his school records. After Dr. Fossum answered affirmatively, the trial court interjected: "What's the difference if she did or she didn't?" Later, the prosecutor objected when defense counsel asked Dr. Fossum what effect positive feedback from neighbors and friends had on defendant. In sustaining the objection, the trial judge stated that the question was cumulative because he thought that it had already been elicited that defendant had "gone to the neighbors to seek approval because he didn't get it at home." The trial court added that he would not allow defense counsel to ask why positive reinforcement from defendant's neighbors and family friends failed to cure defendant's depression: "[i]t didn't, so why do we care? Isn't that the bottom line? I assume because he didn't get it [positive reinforcement] from the father figure or something. Really, where do we go?"

The trial judge also interjected in the following exchange between defense counsel and Dr. Fossum:

Defense counsel: "[I]s that the case in a malignant family?"

Dr. Fossum: "What we've discovered is that once you—"

Court: "Why don't you just answer yes or no, ma'am. If we need an explanation, you can do it."

Dr. Fossum: "The question—"

Court: "The answer is yes."

Shortly thereafter, the court again answered a question for Dr. Fossum, stating "I think the answer is yes." However, Dr. Fossum disagreed stating, "[n]o, I think the answer is no, your honor, if I understood the question."

The trial judge also disparaged defense counsel in front of the jury. For instance, when defense counsel attempted to ask Cindy Medeiros whether her sons would be upset were defendant to receive the death penalty, the trial court sua sponte interjected: "Come on, Mr. Kelley [defense counsel], please.

I don't like to interrupt. You know, there is no way you can get that in. You've been around enough and I don't want to chastise you in front of the jury but we have just gone through, you want to relate what her sons thought . . . . And we are here and holding the jury over late . . . . And clearly you know these questions are objectionable. Why ask them?" Later, the trial court admonished defense counsel in the presence of the jury, saying that "I don't want to criticize you in open court, but you are not grasping my ruling, I don't believe. I can tell this is going nowhere."

At another point, the trial judge chastised defense counsel for attempting to rephrase a question to which an objection had been sustained regarding whether Dr. Fossum ever recalled Linda Sturm saying any favorable things about defendant during an interview. The court cut off defense counsel, stating: "No, no, no. We are back to the same question number one again. I rule, I rule and then you go back and ask the question just a little bit different, *trying to sneak it by*. Is that the particular word I should use? Again, Mr. Kelley, please . . . . So again, admonish the jury that Mr. Kelley's questions are not evidence, *as much as he would like them to be evidence*." (Italics added.) Similarly, the trial judge interjected sua sponte after defense counsel asked a question: "I tell you not to ask a question and you get right up here and ask it anyway. You know, my rulings, unfortunately, I'm like an umpire. And if I make a ruling you are stuck with it."

On numerous occasions, the trial judge interposed his own objections to questions asked by defense counsel. For example, the trial court objected when defense counsel asked a defense witness whether defendant's biological father had had ongoing contact with defendant's sisters, stating: "Mr. Rosenblum [the prosecutor] is looking at the books for things and so forth and isn't that interested. But I'll interject myself . . . ." At one point during the presentation of mitigating evidence, the trial judge interrupted defense counsel's questioning of Dr. Fossum, and invited the prosecutor to object, stating: "It's your case, Mr. Rosenblum. Is there an objection on where we are going?" In a similar incident, the trial judge told a defense witness not to answer a particular question "because there would be an objection." On another occasion, the judge said "Let me interrupt. I see Mr. Rosenblum's lips are moving." During the presentation of mitigating evidence by the defense, there were over 30 occasions in which the trial judge either objected sua sponte or otherwise intervened to disallow a question asked by defense counsel in the absence of an objection by the prosecutor. In comparison, the trial judge intervened fewer than five times to preclude a witness from answering a question posed by the prosecutor.

The trial judge acknowledged the danger that his conduct appeared to favor the prosecution, but one attempt by the court to address this problem only

made matters worse. After a particularly heated exchange between the court and defense counsel regarding the admissibility of certain testimony by Dr. Fossum, the trial judge gave the following lengthy admonition:

"I want to admonish the jury, just a bit. I've done it before. I don't want the jury, and I'm sure you wouldn't with a seriousness of this particular case, get into personality of the attorneys and so forth, whether you like the conduct, the way one attorney tries a case and the way the other one doesn't.

"They're both doing the best for their clients. And I don't want you to think that—I'm here, hopefully neutral and trying to rule on objections. But I think it's obvious to the jury that—I hope they aren't drawing any inference that I'm upset with Mr. Kelley or upset with Mr. Rosenblum. But I would have to say for the record *we have spent an inordinate amount of time whereby objections are raised with regard to questions by Mr. Kelley.*

"And I don't want the jury to think because *it appears that I'm ruling against Mr. Kelley 99 times out of 100 or making these comments,* but the reason I'm doing it is it seems to me that it is up to me to make the proper rulings.

"And I hope the jury isn't feeling that I'm upset with Mr. Kelley or I'm upset with Mr. Rosenblum. It wouldn't be proper for you to consider that. But it would be less than candid if it didn't appear that somewhere along the line that *Mr. Kelley and I aren't agreeing on some of these rulings that have come up repeatedly.* [¶] . . . [¶]

"But I have a duty to hold [the evidence] to what I consider relevant and keep the case moving forward. Some judges sit and don't comment if the earthquake occurred during the court while they're in session. They probably won't say anything. I'm probably what's known as an active judge and I like to hopefully keep things moving and so forth.

"But in the court's opinion, *we have ruled on the same thing four or five times this afternoon.* And I don't want you holding that against Mr. Kelley. If you feel the court is picking on Mr. Kelley in any way or Mr. Rosenblum having to object a lot while Mr. Kelley doesn't have to object, *it's a matter of the questions being asked.* [¶] . . . [¶]

"So there are certain rules. *And this is why attorneys go to school and supposedly learn the rules of evidence. I don't comment on that.* Whether they do or they don't, not picking on anybody. But I said, that's the bottom line." (Italics added.)

■ Although no objection was raised to several of the incidents now cited as misconduct, the People do not take the position that defendant has forfeited all judicial misconduct claims premised on these events. As a general rule, judicial misconduct claims are not preserved for appellate review if no objections were made on those grounds at trial. (See, e.g., *People v. Snow* (2003) 30 Cal.4th 43, 77–78 [132 Cal.Rptr.2d 271, 65 P.3d 749]; *People v. Fudge, supra,* 7 Cal.4th at p. 1108; *People v. Anderson* (1990) 52 Cal.3d 453, 468 [276 Cal.Rptr. 356, 801 P.2d 1107].) However, a defendant's failure to object does not preclude review "when an objection and an admonition could not cure the prejudice caused by" such misconduct, or when objecting would be futile. (*People v. Terry* (1970) 2 Cal.3d 362, 398 [85 Cal.Rptr. 409, 466 P.2d 961]; see also *People v. Perkins* (2003) 109 Cal.App.4th 1562, 1567 [1 Cal.Rptr.3d 271].)

Given the evident hostility between the trial judge and defense counsel during the penalty phase, it would also be unfair to require defense counsel to choose between repeatedly provoking the trial judge into making further negative statements about defense counsel and therefore poisoning the jury against his client or, alternatively, giving up his client's ability to argue misconduct on appeal. On this record, we are convinced that any attempt by defense counsel to object to the trial court's numerous sua sponte objections and derogatory comments "would have been futile and counterproductive to his client." (*People v. Hill* (1998) 17 Cal.4th 800, 821 [72 Cal.Rptr.2d 656, 952 P.2d 673].)

■ "The object of a trial is to ascertain the facts and apply thereto the appropriate rules of law, in order that justice within the law shall be truly administered." (*People v. Mendez* (1924) 193 Cal. 39, 46 [223 P. 65].) To this end, "the court has a duty to see that justice is done and to bring out facts relevant to the jury's determination." (*People v. Santana* (2000) 80 Cal.App.4th 1194, 1206 [96 Cal.Rptr.2d 158].) The trial court has a statutory duty to control trial proceedings, including the introduction and exclusion of evidence. (*People v. Carlucci* (1979) 23 Cal.3d 249, 255 [152 Cal.Rptr. 439, 590 P.2d 15].) As provided by section 1044, it is "the duty of the judge to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved." However, "a judge should be careful not to throw the weight of his judicial position into a case, either for or against the defendant." (*People v. Mahoney, supra,* 201 Cal. at p. 627.)

Trial judges "should be exceedingly discreet in what they say and do in the presence of a jury lest they seem to lean toward or lend their influence to one side or the other." (*People v. Zammora* (1944) 66 Cal.App.2d 166, 210

[152 P.2d 180].) A trial court commits misconduct if it " 'persists in making discourteous and disparaging remarks to a defendant's counsel and witnesses and utters frequent comment from which the jury may plainly perceive that the testimony of the witnesses is not believed by the judge.' " (*People v. Boyette* (2002) 29 Cal.4th 381, 460 [127 Cal.Rptr.2d 544, 58 P.3d 391], quoting *People v. Mahoney, supra,* 201 Cal. at p. 627.)

Under the unique facts of the present case, we hold that the trial judge's conduct during the second penalty phase trial constituted misconduct. The trial judge engaged in a pattern of disparaging defense counsel and defense witnesses in the presence of the jury, and conveyed the impression that he favored the prosecution by frequently interposing objections to defense counsel's questions.

The trial judge's comments during the testimony of defense expert witness Dr. Stein that the expert had "contributed to the federal deficit" and that such contribution was "very depressing and we will need cocaine" were inappropriate. While this apparently was an attempt at humor—always a risky venture during a trial for a capital offense—this court has repeatedly stated that a trial court must avoid comments that convey to the jury the message that the judge does not believe the testimony of the witness. (See *People v. Boyette, supra,* 29 Cal.4th at p. 460; *People v. Mahoney, supra,* 201 Cal. at p. 627.)

The trial court, in remarking upon the impact of federally funded drug studies upon the federal deficit, communicated to the jury that he felt that the federal government was spending too much money on funding the studies of drug experts like Dr. Stein. Even more troubling, the comments made by the trial judge also poked fun at a foundational theory of the defense case—that defendant had become addicted to cocaine in order to self-medicate for depression. Indeed, the trial judge's sarcastic statement that knowing the amount of federal money spent on studying the effects of drugs would be "very depressing and we [the judge and jury] will need cocaine" conveyed to the jury that the trial judge did not take seriously the defense theory in mitigation.

Several comments made by the trial court during the testimony of Dr. Fossum also were improper. It is plain from the record that the judge had become frustrated with Dr. Fossum during the course of her testimony. In the presence of the jury, the trial judge criticized Dr. Fossum for having a "tendency to add to [her] testimony," charged that she "embellish[ed] her answers," and advised her not to use "a lot of adjectives and adverbs and so forth" in her testimony because it was up to the jury to determine the "necessary adjectives." These statements questioned the reliability of the expert's testimony in general, and

suggested to the jury that such testimony had not been based wholly upon the facts. The trial judge might have commented at sidebar or during a recess outside the presence of the jury upon any concerns he had with the style of Dr. Fossum's testimony; however, it was improper for the judge to rebuke an expert witness in front of the jury by suggesting that she was manufacturing or improperly including the descriptive details of her testimony.

The trial judge also improperly expressed indifference to Dr. Fossum's testimony. The trial court interrupted Dr. Fossum's testimony to: (1) ask "[w]hat's the difference if [Dr. Fossum] did or . . . didn't" see signs of defendant's depression by looking at his school records; (2) indicate that he did not care why positive reinforcement from neighbors and friends did not cure defendant's depression; and (3) state that he "assumed" that defendant's depression was not cured because he did not get positive reinforcement "from the father figure or something."

In so doing, the judge conveyed the message to the jury that the trial judge thought that the substance of Dr. Fossum's testimony was of little consequence. It is well recognized that the trial judge may comment on the relevance of evidence, and may sua sponte exclude irrelevant evidence. (*People v. Santana, supra,* 80 Cal.App.4th at p. 1206.) However, if the trial court believed Dr. Fossum's testimony to be legally irrelevant, he could have excluded it on that ground without phrasing his objection as a lack of "caring" about the testimony, which could easily be misconstrued by the jury as a comment that the evidence was useless. Additionally, the trial judge need not have expressed his assumption that defendant did not cure his depression because he "didn't get [positive reinforcement] from the father figure or something," which belittled Dr. Fossum's testimony by reducing it to a Freudian platitude, and communicated to the jury that the trial judge considered such testimony to be rote and therefore not worth considering.

The trial court continued to display impatience with Dr. Fossum, and at times himself answered questions that defense counsel addressed to Dr. Fossum. On one occasion, the trial court attempted to answer a question for Dr. Fossum, and did so incorrectly; although the trial court judge answered a question by stating "I think the answer is yes," Dr. Fossum had to interject to state that the "answer [was] no." By answering Dr. Fossum's questions for her, the trial judge overstepped the proper role of the court. If the trial judge felt that the questions being asked of Dr. Fossum were cumulative or irrelevant, it would have been appropriate for him to object sua sponte on either of those grounds. The trial judge, however, answered the questions himself in front of the jury, conveying to them the message that the questions were so trivial and/or obvious that he himself was able to answer them without possessing the particular expertise of the witness.

The trial judge's behavior towards the two key expert witnesses for the defense conveyed to the jury disdain for the witnesses and their testimony and therefore constituted misconduct. (*People v. Mahoney, supra,* 201 Cal. at p. 622.) In his comments regarding federal expenditures on drug studies, his joking remark that the amount of such money spent would be so depressing as to induce cocaine use, and his statement that defendant's depression was not cured because he did not get positive reinforcement from the father "or something," the trial court made light of the substance of defendant's case in mitigation. Further, the trial court's numerous impatient comments during Dr. Fossum's testimony, his characterization of her testimony as "embellished," and his interjections during her testimony to answer the questions himself, indicated that the judge discounted her testimony. Such behavior, especially considered in the aggregate, conveyed to the jury the unfortunate message that the trial judge did not take seriously the testimony of the defense experts.

The trial judge exacerbated his mistreatment of defense witnesses by repeatedly and improperly disparaging defense counsel, which conveyed to the jury the message that the court was allied with the prosecution. Understandably frustrated by defense counsel's persistent attempts to push the boundaries of the trial court's evidentiary rulings, the trial judge repeatedly reprimanded defense counsel in front of the jury. By accusing defense counsel of purposely trying to "sneak" in improper evidence by rephrasing his questions, and by admonishing the jury that defense counsel's questions were not evidence "as much as he would like them to be evidence," the trial court implied to the jury that defense counsel was deliberately asking improper questions in order to place inadmissible evidence in front of the jury. This suggestion was reinforced by the admonition given to the jury, in which the trial court remarked that defense counsel wanted his questions to be considered as evidence.

"It is completely improper for a judge to advise the jury of negative personal views concerning the competence, honesty, or ethics of the attorneys in a trial . . . . When the court embarks on a personal attack on an attorney, it is not the lawyer who pays the price, but the client." (*People v. Fatone* (1985) 165 Cal.App.3d 1164, 1174–1175 [211 Cal.Rptr. 288].) This principle holds true in instances involving a trial judge's negative reaction to a particular question asked by defense counsel, regardless of whether the judge's ruling on the prosecutor's objection was correct; even if an evidentiary ruling is correct, "that would not justify reprimanding defense counsel before the jury." (*Ibid.;* see also *People v. Black* (1957) 150 Cal.App.2d 494, 499 [310 P.2d 472] [Though counsel's line of inquiry was objectionable, and the evidentiary ruling essentially proper, the judge's remarks accusing counsel of unfairness constituted misconduct.].) The trial court's

comments implying that defense counsel was behaving unethically or in an underhanded fashion constituted misconduct.

The trial judge's negative remarks about defense counsel are also troubling in light of the unequal treatment by the court of the prosecutor and defense counsel. The trial judge objected sua sponte or otherwise interrupted and disallowed numerous questions asked by defense counsel; such interruptions or objections are certainly permissible under section 1044, which outlines the duty of the judge to control trial proceedings and to limit the introduction of evidence "to relevant and material matters." In this case, however, the trial court intervened in a way that created the impression that the trial judge was allied with the prosecution.

The trial court sua sponte intervened more than 30 times during the defense case in mitigation, yet only intervened during the prosecutor's case in aggravation less than five times.[3] As one court colorfully observed, "[w]hen the judge figuratively descends from the bench and enters the arena he takes the risk that he will be besmirched with gore or sawdust, and that he will be criticized as interfering either on behalf of the bull or the matador." (*People v. Bowman* (1966) 240 Cal.App.2d 358, 382 [49 Cal.Rptr. 772].) Where the trial judge, as was the case here, intervenes from the bench much more frequently on one side than he does on the other, such criticism may gain credibility among the jury.

The jury had already heard the trial judge make comments such as "[l]et me interrupt. I see Mr. Rosenblum [the prosecutor]'s lips are moving," and "Mr. Rosenblum is looking at the books for things . . . . But I'll interject myself." These comments, in which the trial court noted that he was, in effect, filling in for an otherwise occupied prosecutor, communicated to the jury the message that the trial judge was collaborating with the prosecutor.[4] Though a numerical disparity between sua sponte interventions by the trial court during the prosecution case and defense case does not on its own

---

[3] On many occasions, these sua sponte interruptions tended to be negative and disparaging. A representative example occurred when defense counsel asked defendant's sister about when she and defendant worked as bus drivers for the school district. The judge interrupted, asking: "What in the world had this got to do? You are going into whether she drove the bus what, for whom, we got to move the case forward. This is just going on and on."

[4] Indeed, the trial judge remarked to counsel outside the presence of the jury that he was interjecting more often in order to make the prosecutor "tune . . . back in" and that he did so because he "didn't want to leave [the prosecutor] shut out." The prosecutor replied that, although he had a continuing objection to certain testimony, he was troubled at being torn between "whether to object or not to what I think is inadmissible evidence." It is clear from this exchange that the prosecutor thought that certain evidence was inadmissible, but was hesitant for tactical reasons to object continually to defense counsel's questions, and that the trial judge, worried that the prosecution either was not "tuned in" or was being "shut out," took it upon himself to make the prosecutor's objections for him.

constitute misconduct, in light of the trial judge's improper comments disparaging defense counsel and his comments implying an alliance with Mr. Rosenblum, such uneven intervention strengthens the impression that the trial judge was allied with the prosecution. A trial judge who creates the impression that he is allied with the prosecution has engaged in improper conduct. (See, e.g., *People v. Carpenter, supra,* 15 Cal.4th at p. 353.) The trial judge's behavior, in creating such an impression by intervening in a significantly uneven fashion and making comments that implied that such interventions were made in the prosecutor's stead, constituted misconduct.

Recognizing that his repeated interruptions of the defense case in mitigation were rather unusual and perhaps improper, the trial judge spoke to the jury on several occasions about the scope of his own participation in the trial. Such admonitions, however, did not cure the above instances of misconduct. Rather, the lengthy admonition given by the trial judge, purportedly to ensure that his behavior during the presentation of mitigating evidence was not construed as favoritism to the prosecution, achieved the opposite effect. Rather than merely reiterating to the jury that it should not infer any favoritism or disapproval from his conduct, the trial judge embellished his remarks in a way that undermined the purpose of addressing the jury on the issue of his own conduct.

Despite stating that he hoped that the jury was not "drawing any inference that I'm upset with Mr. Kelley or upset with Mr. Rosenblum," the trial court immediately followed with the comments that "we have spent an inordinate amount of time whereby objections are raised with regard to questions by Mr. Kelley," and that it "appear[e]d that [the court was] ruling against Mr. Kelley 99 times out of 100." Shortly thereafter, the trial court noted that he had repeatedly ruled on similar issues that afternoon, but that such repetition was "a matter of the questions being asked."

Such comments inevitably conveyed to the jury the message that the trial court thought that defense counsel was wasting the court's—and the jury's—time by asking inappropriate questions. The trial judge bolstered this impression by noting that 99 percent of the time he had ruled against defense counsel. Even were that statistic accurate, it was improper for the trial judge to have emphasized that the prosecutor was prevailing on a large percentage of his objections. Indeed, the use of such "statistics" by a trial judge is, in itself, inappropriate. The trial court's duty is to control the proceedings of the trial, and to act—as the trial court had earlier characterized his role—"like an umpire," not as a color commentator on the relative success of counsel.

The trial judge closed his admonition to the jury by questioning defense counsel's competence and knowledge of the rules of evidence. In a statement

to the jury that purported to convey the trial judge's neutrality, he achieved the opposite result by adding that he would not comment on "why attorneys go to school and *supposedly* learn the rules of evidence." (Italics added.) Plainly, this statement was a barb directed at defense counsel and his perceived inability to ask appropriate questions. The trial court's phrasing that he would *not* comment on the subject, and his statement that attorneys *supposedly* went to law school and learned the rules of evidence did not lessen the blow. It is no less improper for a trial judge to, in the words of a Spanish proverb, *"tira la piedra y esconde la mano"*—which translates as "throw the rock and hide the hand"—than it is for him to throw the rock in the first place.

## C. *Prejudice*

Although no one instance of misconduct appears to, in itself, require reversal, the cumulative effect of the trial judge's conduct requires reversal. We look very closely at the question of prejudice in this instance, where the death penalty was imposed on a penalty phase retrial after the majority of the prior jury voted in favor of a sentence of life in prison without the possibility of parole.

Considered in the aggregate, the inappropriate comments made by the trial judge spanned the entire penalty phase trial, from voir dire through the defense case in mitigation. "Perhaps no one of them is important in itself but when added together their influence increases as does the size of a snowball rolling downhill." (*People v. Burns* (1952) 109 Cal.App.2d 524, 543 [241 P.2d 308].) The numerous instances of misconduct created an atmosphere of unfairness and were likely to have led the jury to conclude that "the trial court found the People's case against [defendant] to be strong and [defendant]'s evidence to be questionable, at best." (*People v. Santana, supra,* 80 Cal.App.4th at p. 1207.)

Throughout defendant's second penalty phase trial, beginning with voir dire, and continuing through defense counsel's presentation of mitigating evidence, the trial court interjected itself unnecessarily and inappropriately into the adversary process. Many of the trial judge's comments should have been made at sidebar, and not in front of the jury; in commenting in front of the jury, the trial judge often made comments that were unnecessary to explain his rulings from the bench, and also substantively undermined the defense theory of the case.

The trial court erroneously commented during voir dire that it was a "gimme" that defendant had premeditated the murders despite knowing from the first penalty phase trial that defendant's *lack* of premeditation was a central piece

of defendant's case in mitigation. Further, the trial court made clear to the jury that he did not take seriously the expert witnesses put on by the defense, making various sarcastic remarks related to their testimony and qualifications. It was also abundantly clear, even upon assessment of a "cold record," that the trial judge did not approve of the aggressive style of defense counsel and conveyed this disapproval on numerous occasions to the jury by commenting on defense counsel's training, blaming defense counsel for the length of the penalty phase trial, and specifically pointing out to the jury that he had ruled against defense counsel "99 times out of 100." Furthermore, the trial judge was not evenhanded; rather, he interjected himself more vociferously and on many more occasions during the defense case in mitigation than he did during the prosecution's case in aggravation.

Although the trial court admonished the jury not to infer any bias on the part of the court based on comments that he made during the trial, at least one such admonishment was itself undermined by the inclusion of inappropriate comments disparaging defense counsel. In any case, even were the jury properly admonished, it would be highly improbable that such admonishment could prevail over the manner in which the trial judge conducted himself throughout the penalty phase trial. (See *People v. Santana, supra,* 80 Cal.App.4th at p. 1207 [repeated admonition could not cure the impression given to the jury that the trial judge found the defense case to be weak]; *People v. Burns, supra,* 109 Cal.App.2d at p. 542 ["While it is true that from time to time the judge admonished the jury that they were the sole judges of the evidence and that they must draw no conclusions as to guilt or innocence from the court's remarks, it is difficult to understand how these admonitions could have overcome the evident attitude of the judge throughout the trial"].)

■ The cumulative effect of the trial judge's comments requires a reversal of the death sentence under either the *Chapman* or *Watson* standards of review. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]; *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) Although the crime committed was undeniably heinous, a death sentence in this case was by no means a foregone conclusion. Defendant was quite young at the time of the murders and had no criminal history. At the guilt phase, defendant succeeded in avoiding a conviction for premeditated and deliberate murder, and at the first penalty phase, the jury was unable to reach a verdict, voting 10 to 2 in favor of life imprisonment without the possibility of parole. It was reasonably probable that the second penalty phase jury's verdict would have been different had the trial judge exhibited the patience, dignity, and courtesy that is expected of all judges. (See Cal. Code Jud. Ethics, canon 3B(4) ["A judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity . . . ."].)

### III. DISPOSITION

The judgment is reversed as to penalty for the reasons set forth above. In all other respects, the judgment is affirmed.

George, C. J., Kennard, J., Werdegar, J., and Gomes, J.,* concurred.

**BAXTER, J.,** Dissenting.—I respectfully dissent from the majority's decision to vacate the death judgment, rendered after a second penalty trial, in this aggravated case. The majority does not base this decision upon lapses in the evidence (which was overwhelming), or upon identified errors of law that prejudiced defendant's substantial rights. Instead, the majority, by strained reasoning, discerns a pattern of judicial misconduct it deems sufficient to undermine confidence in the trial's fairness. In doing so, the majority places exaggerated reliance on petty matters, many of which defendant has not challenged here or below. Indeed, neither defendant nor the majority criticizes the seasoned trial judge for his handling of the *guilt* phase. Moreover, in assessing the effect of the judge's conduct on the penalty jury, the majority ignores the cold-blooded nature of this triple slaying. Reversal, and a remand for a *third* penalty trial, are unnecessary in my view.

Like defendant, the majority first focuses on the trial court's comment to Prospective Juror C. S., in front of the entire venire, about her questionnaire at the penalty retrial (i.e., "You . . . [believe] in the death penalty when it was premeditated murder, that is a gimme[,] . . . all over and done with, . . . in the penalty phase"). (Maj. opn., *ante*, at p. 1231, italics omitted.) According to the majority, the court thereby conveyed that the penalty jury was *bound* by a prior finding of premeditation, and could not consider that issue further. Then, the majority notes, the court denied defendant's request for a clarifying instruction that (as was true) the guilt jury had not found premeditation. Hence, the majority concludes, the court wrongly eliminated the lack of premeditation as a sentencing factor, severely damaged defense strategy, and unfairly encouraged a death sentence.

The trial court, albeit inartfully, was simply trying to explain that, regardless of issues, like premeditation, that might have been decided at the guilt trial, the penalty jurors must examine more broadly whether the punishment should be death or life without parole. In other words, the court sought to caution that a juror could not automatically impose death for a premeditated murder. I find it difficult to conceive that jurors could have been seriously misled.

---

*Associate Justice, Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Moreover, the majority ignores subsequent steps taken by the trial court to ensure no impropriety or confusion occurred. (*People v. Melton* (1988) 44 Cal.3d 713, 735 [244 Cal.Rptr. 867, 750 P.2d 741] (*Melton*) [judging propriety and effect of court's comment by both its content and surrounding circumstances].) When voir dire resumed, the court promptly advised prospective jurors, including C. S., to "disregard[] the court's comment [about premeditation] before." Also, to ensure that neither C. S. nor anyone else held erroneous views, the court reiterated that eligibility for a death sentence requires "more" than a conviction of first degree premeditated murder, to wit, a special circumstance finding.[1] Thus, though the court did not provide the precise clarification the defense preferred, it substantially addressed the defense concerns about its "premeditation" comment. While the court might have handled the situation more adeptly, the majority's severe reaction to this incident seems unfair.

As discussed below, the other incidents of alleged misconduct primarily occurred during the testimony of Dr. Stein and Dr. Fossum. These defense experts described the general effects of cocaine use and defendant's social history, respectively. The majority concludes that the court belittled these witnesses in front of the jury, disparaged defense counsel in the process, and created the impression that it was an agent of the prosecution and an enemy of the defense.

As the majority seems to concede, none of the alleged misconduct on which it relies prompted a timely defense objection on that ground. For this reason, perhaps, defendant has avoided basing appellate claims of judicial misconduct on many of the same events. Contrary to what the majority implies, nothing allows this court to ignore the procedural bar that generally applies in such situations. We have said that a timely objection and appropriate admonition will normally cure any harm flowing from judicial misconduct of the kind alleged here. (*People v. Monterroso* (2004) 34 Cal.4th 743, 759 [22 Cal.Rptr.3d 1, 101 P.3d 956] (*Monterroso*).) We also cannot speculate that the trial court would have refused to correct any error if given the opportunity to do so. (See *Melton, supra*, 44 Cal.3d 713, 735.) Hence, the majority wrongly assumes that the events used to reverse the judgment are properly before this court on appeal.

On the merits, judicial comments made during the examination of defense witnesses were hardly as significant as the majority suggests. (See maj. opn., *ante*, pp. 1233–1243.) The references to Dr. Stein's grant money and to cocaine's antidepressant effect were humorous quips of the kind that

---

[1] Of course, the guilt jury's failure to return a "premeditated murder" verdict did not prevent the penalty jurors from concluding, as a circumstance of the crime (Pen. Code, § 190.3, factor (a)), that the murder *was* premeditated. Indeed, there was substantial evidence to that effect.

have not been deemed serious or harmful before. (E.g., *Melton, supra,* 44 Cal.3d 713, 753–754 [jests aimed at defense expert and counsel]; see *Monterroso, supra,* 34 Cal.4th 743, 761–762; *People v. Riel* (2000) 22 Cal.4th 1153, 1177 [96 Cal.Rptr.2d 1, 998 P.2d 969]; *People v. Freeman* (1994) 8 Cal.4th 450, 511–512 [34 Cal.Rptr.2d 558, 882 P.2d 249].)

In all the other incidents on which the majority relies, the trial court simply adopted a colloquial style when applying the rules of evidence, and excluding testimony that was irrelevant or nonresponsive. For instance, the court asked why anyone should "care" about Dr. Fossum's answer to one question, and chided counsel for trying to "sneak by" a particular ruling another time. The majority does not find any error in the court's substantive rulings on these evidentiary points. Moreover, though the majority intimates that the court should have expressed its concerns at sidebar, rather than in front of the jury, it cites no authority requiring a private bench conference each time routine sua sponte rulings are made. (See *People v. Fudge* (1994) 7 Cal.4th 1075, 1108 [31 Cal.Rptr.2d 321, 875 P.2d 36] [trial court has broad discretion in handling evidentiary questions and restricting bench conferences].) Even if the court would have been better advised to speak with more decorum, the comments did not come close to denigrating defense counsel, undermining defense witnesses, or damaging defense strategy.

Finally, I disagree with the majority that the trial court's actions had a cumulative prejudicial effect. In reaching this conclusion, the majority focuses exclusively on the disputed remarks themselves. Such an approach removes, in essence, the aggravating nature of the capital crimes from the prejudice analysis.

Evidence admitted at the penalty retrial identified defendant as the person who robbed and killed three young men at the business where he used to work (e.g., murder weapon, bloodstained clothes, and taped confessions). Each victim was bound and shot in the head execution-style from close range. Defendant evidently planned to use the money he stole from the cash register to buy drugs or a new motorcycle. The jury knew that at least two of the victims cried or begged for mercy before they died. The jury also knew that defendant ignored these pleas even though he had been friendly with the victims in the past. Indeed, the evidence indicated that, before the murders, defendant had met family members and friends of the victims, and thus was aware of the emotional trauma he would cause by killing them. These family members and friends testified to the great pain and grief he had caused by his homicidal acts.

Unlike the majority, I do not attribute the death verdict to the manner in which the trial court conducted the legal proceedings. The blame rests squarely on defendant and the capital crimes he committed. Nothing the majority has cited persuades me that a third trial to determine defendant's appropriate punishment is justified. I therefore dissent.

Chin, J., concurred.

Respondent's petition for a rehearing was denied May 17, 2006. Baxter, J., Chin, J., and Corrigan, J., were of the opinion that the petition should be granted.