[No. B224166. Second Dist., Div. Eight. Aug. 24, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
JERRY SORRELS et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION***]**

*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, only the following parts are certified for publication: the Facts, part II.A. of the Discussion on Defendant Jenkins's Appeal, and the Disposition.

1156

## Counsel

Sharon M. Jones, under appointment by the Court of Appeal, for Defendant and Appellant Jerry Sorrels.

Victor J. Morse, under appointment by the Court of Appeal, for Defendant and Appellant Daymon C. Garrett.

Deborah L. Hawkins, under appointment by the Court of Appeal, for Defendant and Appellant Roderick A. Jenkins.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Stephanie A. Miyoshi and Margaret E. Maxwell, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BIGELOW, P. J.—**

\* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

.

## FACTS

Laura Sanchez was shot as she stopped her blue Astrovan in front of her home on Long Beach Avenue on March 18, 2007. Her son, Jose B., was sitting in the passenger seat and saw a white car stop on the other side of the van. Sanchez told Jose to "duck down." As he got out of the van, he heard two sets of gunshots, the first set very loud and the second set less so. He dropped to the ground and began to crawl towards the driveway.

Sanchez's nieces, Sandy and Jeanette C., were sitting inside their mother's SUV, which was parked in Sanchez's driveway. Both girls heard a set of very loud gunshots coming from a white passenger car and a second set that was not as loud coming from a gray truck. Sandy saw gunshots come from a white four-door car that had stopped behind her aunt's van. She and Jeanette also saw gunshots come from a gray SUV that had pulled up next to their car. The cars drove away after the shooting. A 911 caller reported that a gray Chevrolet Trailblazer with two male Hispanics in it was involved in the shooting.

Sanchez died from a gunshot wound to her left lung and heart, which caused massive hemorrhaging and death within two minutes. The bullet entered the left side of Sanchez's back and exited her right upper chest. Forensic testing showed it would have been unusual for a small caliber bullet, such as a .25-caliber bullet, to pass through a human body, but not a larger caliber bullet.

Los Angeles Police Detective Daniel Gersna arrived on the scene shortly before 1:00 a.m. He recovered two .25-caliber bullets from the Astrovan and

---

*See footnote, *ante*, page 1155.

two larger bullets on Long Beach Avenue and from the driver's seat. There was another bullet found underneath the van. The .25-caliber bullets were found to have been fired from a handgun later recovered from Deon Harper, a member of the Pueblo Bishop gang. The two larger caliber bullets were found to be most likely .44-caliber bullets from a revolver. Investigators used trajectory rods to determine the path the bullets took when they entered Sanchez's Astrovan. It was determined that the larger caliber bullets were fired from the rear of the Astrovan towards the front while the .25-caliber bullets were shot from the front of the van towards the back.

J.K. Gray, an admitted Pueblo Bishop gang member, testified at the preliminary hearing that on the day Sanchez was shot, he and his "homeboys" Jamal "PJ" Payne, Damon "D-Dog" Garrett, Roderick Jenkins and Jerry "KO" Sorrels, among others, were outside the Pueblo Del Rio Housing Project located at 55th Street and Long Beach Avenue in Los Angeles. The group discussed "going and doing something down in Athens" though Gray denied there was any talk of shooting anyone. Gray was aware that another Pueblo Bishop gang member named "Pancho" had been shot by an Athens Park gang member. The group left in three cars, a gray Chevrolet Trailblazer, a black Cadillac Escalade and a white Chevrolet Impala. Payne drove the Trailblazer, Garrett drove the Escalade and Anthony "Baby Damu" Lowe drove the Impala. Gray sat in the back of the Trailblazer with Arthur Maiden and Jenkins sat in the front passenger seat, with a firearm. Sorrels rode with Garrett in the Escalade and Marquez "Oozie" Edwards rode with Lowe in the Impala.

Gray testified that the caravan drove south on Avalon Boulevard but did not see any Athens Park gang members. They turned back towards the Pueblo Del Rio Housing Project when Garrett stopped the Escalade at Long Beach Avenue and 48th Place. Gray saw Sorrels reach out of the Escalade's front passenger window and fire a gun. Payne stopped his Trailblazer behind the Escalade and Jenkins fired a handgun from the car. They then drove away. Gray was granted immunity for his testimony, which he believed meant that no charges would be filed against him even if he was the shooter. At trial, however, Gray refused to answer any questions and invoked his Fifth Amendment privilege. As a result, the trial court found Gray was unavailable to testify and admitted his preliminary hearing testimony into evidence.

Detective Gersna reviewed photos of Pueblo Bishop gang members together, including Gray, Payne, Marquise Edwards, Garrett, Pancho Shepherd, Arthur Maiden, Sorrels, and Jenkins. When Detective Gersna spoke with Pancho Shepherd on March 18, 2007, he noticed that one of his hands was injured.

Detective Gersna viewed footage from a video surveillance camera located in a tow yard at the corner of Long Beach Avenue and Vernon Avenue called Lara's Tow. The video showed a caravan consisting of a black Escalade, a white Chevrolet Impala, and a gray Chevrolet Trailblazer driving on Vernon Avenue from Long Beach Avenue. During his investigation, Gersna spotted a white Chevrolet Impala at the Pueblo Del Rio Housing Project. Anthony "Baby Damu" Lowe, an admitted Pueblo Bishop gang member, was driving the Impala at the time and fled when Detective Gersna and his partner made the stop. The Impala was later discovered to be registered to Lowe's mother.

Detective Gersna, who had also personally searched a black Cadillac Escalade belonging to Garrett's grandmother and a gray Chevrolet Trailblazer belonging to Jamal Payne, opined the Escalade in the Lara's Tow video was the same as the one driven by Garrett, the white Impala in the video was the one driven by Lowe and the Trailblazer was the one belonging to Payne. Sanchez's son identified the white Impala in the video as the same one he saw during the shooting. Sanchez's niece, Sandy C., also identified the white Impala and gray Trailblazer in the video as the vehicles she saw during the shooting. Sanchez's other niece, Jeanette C., identified the gray Trailblazer in the Lara's Tow video as the car from which she saw gunfire originate.

Dario Salazar Moreno was interviewed by Detective Gersna on April 5, 2007. Moreno identified Payne, Gray, Jenkins and Maiden from photographs. Moreno also identified a .25-caliber semiautomatic handgun that another Pueblo Bishop gang member, Deon Harper, had in his possession at the time of his arrest. Moreno told Detective Gersna that he saw Harper holding the same gun approximately a month before Sanchez's murder. In the early morning after Sanchez's murder, Payne, Gray, Jenkins and Maiden arrived at Moreno's home. Gray told Moreno that, "We just shot someone, and you need to take the guns because the heat is coming." Jenkins threatened to hit him if he did not take the guns. The next day, Moreno heard them talking about killing a woman while they were trying to shoot a 38th Street gang member. Moreno identified Gray and Payne as the shooters and Maiden and Jenkins as passengers, but refused to explain how he came by this information. At trial, Moreno denied a detective interviewed him on April 5, 2007, and denied ever hearing of Sanchez's murder. He also testified that he lived at the Pueblo Del Rio Housing Project and that he knew snitches that testified against gang members were killed.

Detective Gersna interviewed Sorrels on April 22, 2007. Sorrels waived his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*). Sorrels told Gersna that his moniker was "KO." His cousin, who had been killed, had also been known as "KO." Sorrels denied any involvement in the shooting, telling Detective Gersna that he went

to church that evening and then went home. When Sorrels continued to deny any involvement in the Sanchez shooting, Detective Gersna and his partner left the interview room. In a conversation with Detective Richard Arciniega after Detective Gersna had left, Sorrels said he believed the 38th Street gang was responsible for killing his cousin KO. When Gersna returned, Sorrels admitted that he was driving a black SUV to a strip club in Torrance when someone approached his car near 48th Street and Long Beach. He fired his revolver several times in the air to scare him off.

On April 27, 2007, Garrett and Sorrels were placed in a monitored cell together and their recorded statements were admitted into evidence at trial. Sorrels told Garrett that he suspected Gray was snitching because the police showed him "every picture [ex]cept for this nigga picture, Blood." Sorrels also told Garrett that he had erased Garrett's phone number as well as "Baby Damu" Lowe's. While in the cell, Garrett spoke with someone on his mobile phone. He told that person that he had been "booked . . . 187."[1] He later noted, "They still can't prove nothin[g]. Maybe we was passin' by." He also said, "I could be put away from everything that really matters man. You know, I really fucked up, man. I could be put away from everything that really matters, man." He then noted that "this is a learning lesson, do right. That's all it is."

On May 2, 2007, Detective Gersna interviewed Jenkins, who waived his *Miranda* rights. Jenkins told Gersna that he was going towards Vernon when he heard gunshots on the passenger side of the car. Jenkins was arrested and placed in a monitored cell inside Parker Center with Arven Kemp on May 4, 2007. In the recording, which was also admitted into evidence at trial, Jenkins and Kemp discussed what the police had told them about Sanchez's murder. Jenkins told Kemp he did not believe that the police had any photographs of him because his windows were tinted and he thought the only camera on Long Beach Avenue faced oncoming traffic. He suspected that "someone is really snitching" and described an altercation between an Athens Park gang member and a Pueblo Bishop gang member that resulted from someone snitching. He stated he did not care that a Pueblo Bishop gang member had been shot in the hand because he was a snitch.

He also told Kemp that one of his "homies" had been arrested in possession of his "strap" or gun and he was concerned the other gang member would snitch on him. He said, "That was the strap they said murdered the bitch. But now all the sudden, they tryin' to say that the other strap murdered the bitch. You feel me? They ran forensics and shit like that and the other strap murdered the bitch. You feel me? They say that like they already know."

---

[1] California Penal Code section 187 defines the crime of murder.

An August 30, 2007 information charged Payne, Sorrels, Garrett and Jenkins with murder. (Pen. Code, § 187, subd. (a).)[2] It also included allegations that a principal personally used a firearm (§ 12022.53, subds. (b) & (e)), that a principal personally discharged a firearm (§ 12022.53, subds. (c) & (e)), that the discharge caused great bodily injury and death (§ 12022.53, subds. (d) & (e)), and that the offense was committed to benefit a criminal street gang (§ 186.22, subd. (b)(1)(C)). Sorrels, Garrett and Jenkins were tried together.[3]

. At trial, Officer Anthony Saenz testified as the prosecution's gang expert. He testified that Pueblo Bishop was a primarily African-American gang with approximately 350 members, some of whom live in the Pueblo Del Rio Housing Project. The Pueblo Bishop gang's primary activities included murder, attempted murder, carjacking, robbery, extortion, witness intimidation, criminal threats, possession and sale of firearms and drugs and vandalism. Given a hypothetical with circumstances identical to this case, Officer Saenz opined that the murder was committed for the benefit of the Pueblo Bishop gang.

Defendants were first tried in 2008. A mistrial was declared when the jury failed to reach a unanimous verdict. At the retrial in 2009, the second jury found them guilty of first degree murder. The jury found true all of the gang and firearm enhancement allegations as to Sorrels; it found true the gang enhancement allegation as to Garrett but none of the firearm enhancement allegations. As to Jenkins, the jury found true the gang enhancement allegation and the allegations that a principal used a firearm and that a principal discharged a firearm, but found not true that a principal personally and intentionally discharged a firearm which proximately caused great bodily injury and death to Sanchez.

Sorrels was sentenced to 25 years to life, plus 25 years for the section 12022.53, subdivision (d) firearm enhancement. Garrett was sentenced to 25 years to life and Jenkins was sentenced to 25 years to life, plus a determinate term of 20 years for the section 12022.53, subdivision (c) firearm enhancement. All three defendants appealed.

## DISCUSSION*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

[2] All further section references are to the Penal Code unless otherwise specified.

[3] Jamal Payne was convicted in a separate proceeding.

*See footnote, *ante*, page 1155.

### *Defendant Sorrel's Appeal**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### *Defendant Jenkins's Appeal*

I. *Comparative Juror Analysis Does Not Reveal Discriminatory Intent in the Prosecutor's Challenge of Two African-American Jurors**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

II. *The Trial Court Did Not Commit Judicial Misconduct**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

#### A. *Trial Court Statement to Prospective Jurors*

At the beginning of voir dire, the trial court read the following statement[8] to the prospective jurors over defense objections:

"Now I'm going to read a brief statement of the case to you to tell you a little bit more about the case.

"The purpose of reading this statement is to give you a general idea about what the case is about and is not a substitute for evidence. None of the things in the statement are evidence, and you may not consider what's in the statement in deciding what happened.

"It remains to be seen whether the evidence would prove any of this. This case involves one count of murder. There's also an allegation that the crime was committed for the benefit of a criminal street gang and that it was committed using handguns. The crime allegedly occurred in 2007 on Long Beach Avenue between Vernon and Slauson in the southeast area of the City of Los Angeles.

"The prosecution contends that all of the following occurred. These are just contentions at this point.

---

*See footnote, *ante*, page 1155.

[8] The trial court made this statement—as he must—to each of three different panels of potential jurors. While the wording to each differed slightly, the statement was essentially the same to all three. We reproduce the statement as it was read to the first panel.

"That on March 18, 2007, three vehicles containing eight Pueblo Bishop gang members left in a caravan from the Pueblo Del Rio Housing Project, which is located at 55th and Compton.

"The first vehicle was a black Cadillac Escalade containing two Pueblo Bishop gang members. The second was a silver gray Chevrolet Trailblazer with four gang members. The third was a white Chevrolet Impala with two gang members.

"All three vehicles drove south on Avalon Boulevard to 135th Street, allegedly seeking to retaliate for the shooting of a fellow gang member before. Locating no Athens Park gang members, the three vehicles drove back on Avalon Boulevard to the Pueblo Del Rio Housing Project and then to a rival gang's territory, north of the project on Long Beach Avenue.

"There, they observed a person they suspected of being a 38th Street gang member entering a blue Chevrolet Astrovan.

"The caravan pulled alongside the Astrovan. The passenger in the black Escalade fired a large caliber handgun into the Astrovan, striking Laura Sanchez and causing her death.

"The Escalade then drove forward. The Chevy Trailblazer pulled up next to the Astrovan, and the front passenger fired a small caliber handgun into the Astrovan. The caravan then drove northbound on Long Beach Avenue to Vernon and made its way back to the Pueblo Del Rio Housing Project.

"Laura Sanchez was transported by paramedics to County U.S.C. Medical Center where she died. Thereafter, the police investigation commenced.

"The defense disputes all of the People's contentions. The People's contentions are not evidence. Although the defendant has no burden of proof, the defense may introduce evidence to rebut the People's contentions.

"You're going to hear from civilian eyewitnesses about what they claim they observed. You'll hear from a deputy medical examiner from the Los Angeles County Department of Coroner, who examined the body of Laura Sanchez and made a determination as to the cause and type of death.

"You'll also hear from police detectives who investigated the crime. You'll also hear from police gang experts. As I've stated at the beginning, the purpose of reading this statement is to give you a general idea about what the case concerns.

"None of the things in the statement are evidence, and you may not consider what is in this statement in deciding what happened. It remains to be seen whether any of the People's contentions can be proven beyond a reasonable doubt."

Jenkins contends that the statement amounted to a second opening statement on behalf of the prosecution because it focused on the details of the case that were favorable to the prosecution and allowed the jury to prejudge the evidence. Further, the trial court demonstrated a bias in front of the prospective jurors which severely prejudiced the defendants and warrants reversal of their convictions. We disagree.

The trial court's reading of a brief overview of the facts before conducting voir dire is commonplace in modern-day trial courts. In fact, judges are encouraged to give such statements to the juries for a number of reasons. First, it serves as a means of giving the jurors an introduction to the case. This assists both the court and the parties in their subsequent questioning of jurors to determine if the jurors have some previous knowledge of the facts of the case, live in the area where the crime occurred, know the victims, defendants or gangs involved, or have some affiliation with the responding police, governmental agencies, and businesses. Second, an overview of the facts in a case such as this may help a trial judge encourage jurors to serve, a not insignificant fact in the current environment where jurors will make every effort to avoid jury service. In addition, the statement also serves to introduce or remind jurors of important legal principles underlying a criminal case—that statements by the judge are not evidence, that the prosecution's contentions are not evidence, that the defense does not have to prove anything or produce any evidence, and the all-important burden on the prosecution to prove its case beyond a reasonable doubt.

■ Indeed, the California Standards for Judicial Administration, section 4.30(b)(8), directs a criminal trial judge during voir dire to inform the jury of the charges against a defendant, and the section of the Penal Code alleged to have been violated. Most importantly, the standard directs the trial judge to "describe the offense[s]." (*Ibid.*, italics omitted.) Further, the trial judge is to inform the jury that "the defendant has pleaded not guilty, and the jury will have to decide whether the defendant's guilt has been proved beyond a reasonable doubt." (*Ibid.*)

The trial judge here did nothing more than follow these rules. He even changed his description of the offenses to accommodate specific objections to the proposed description of the offenses made by defense counsel. He began and ended his brief comments with admonitions that properly directed the jury on how to consider his comments. In the beginning and at the end of the

statement, the trial judge told the jury that "[n]one of the things in the statement are evidence, and you may not consider what's in the statement in deciding what happened. [¶] It remains to be seen whether the evidence would prove any of this." He also noted, "[t]he defense disputes all of the People's contentions. The People's contentions are not evidence." There was no error.

■ Neither has Jenkins presented us with any case that leads us to find anything wrong with the trial court's statement. *People v. Rodriguez* (1986) 42 Cal.3d 730 [230 Cal.Rptr. 667, 726 P.2d 113], provides guidance. There, the question was whether the trial court erred when it commented on the evidence after the jury announced it was deadlocked. The California Supreme Court explained "[t]he trial judge's privilege not only to summarize the evidence, but to analyze it critically, is rooted in English common law." (*Id.* at p. 766.) The trial court has sound discretion to summarize the evidence with no limitations on its content or timing so long as it is "accurate, temperate, nonargumentative, and scrupulously fair." (*Ibid.*, citations omitted.) Because a trial court's commentary "may sometimes invade the accused's countervailing right to independent jury determination of the facts bearing on his guilt or innocence. . . . [t]he trial court may not, in the guise of privileged comment, withdraw material evidence from the jury's consideration, distort the record, expressly or impliedly direct a verdict, or otherwise usurp the jury's ultimate factfinding power." (*Ibid.*) The court further stated that judicial comments may be drafted by counsel if careful scrutiny is provided by the trial judge. (*Id.* at p. 774, fn. 13.)

■ None of the cases cited by the defense contradicts these principles. Neither does the trial court's statement match the conduct which these cases have found objectionable. Unlike the trial court in *People v. Campbell* (1958) 162 Cal.App.2d 776, 787 [329 P.2d 82], this court did not question witnesses inappropriately. In *Campbell*, the trial court "[i]n 15 or more instances, . . . interrupted the examination of the People's witnesses by the deputy district attorney by questions which were calculated to and did elicit testimony seriously adverse to the defendant." (*Id.* at p. 786.) By contrast, "the court cross-examined witnesses for the defendant in a manner that was abrupt and critical." (*Ibid.*) There was no such bias exhibited by the trial court here. As described above, the trial court was very careful to preface and conclude the statement with the admonition that it was not evidence and the prosecution had the burden of proving the things stated.

Though *People v. Foster* (2010) 50 Cal.4th 1301, 1323 [117 Cal.Rptr.3d 658, 242 P.3d 105] and *People v. Tate* (2010) 49 Cal.4th 635 [112 Cal.Rptr.3d 156, 234 P.3d 428], also relied upon by defendants, address issues raised during voir dire, they are distinguishable. In *Foster*, the trial court presented

potential jurors with a 29-page questionnaire that defendant conceded on appeal was adequate. The trial court did not conduct any oral questioning of the venire. (*Foster, supra*, at p. 1323, fn. 11.) The question presented in that case was whether the examination of the prospective jurors was sufficient to ensure any bias was revealed. (*Id.* at p. 1322.) There was no challenge to the statements made by the trial judge. The case is inapplicable to the facts presented here. In *Tate*, a defendant's proposed script for death qualification voir dire included various admonitions against prejudgment but also included specific details of the case, including that the victim was stabbed and hit with blunt instruments and her ring finger was severed and her wedding rings taken. (*Tate, supra*, at p. 655.) The Supreme Court found that the trial court did not abuse its discretion when it omitted the detail regarding the severed finger. Despite the admonitions, the defense statement "would nonetheless have invited prospective jurors to focus on specific details about the case at the outset, and to begin to form judgments and opinions about the appropriate penalty in advance of hearing the trial evidence." (*Id.* at p. 660.) Unlike *Tate*, this case does not involve a questionnaire in a death penalty case where jurors are questioned about their ability to keep an open mind on the decision of whether or not to impose that ultimate penalty. The issues that come into play in such a case are entirely different. In addition, there were no similarly outrageous details which would have invited prejudgment in this case. Each of the cases cited by Jenkins is distinguishable from the facts at hand. Jenkins has presented no case which holds that a trial court's summary of the allegations at the beginning of voir dire amounts to misconduct. For all of these reasons, we decline to find error in the trial court's reading the overview of the facts of this case.

B. *Trial Court's Demeanor Toward Counsel**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

III.–VI.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Defendant Garrett's Appeal**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante*, page 1155.

## DISPOSITION

The judgments of all three defendants are affirmed.

Grimes, J., concurred.

**RUBIN, J.,** Concurring.—I concur in the affirmance of the convictions of all three defendants and specifically with the following parts of the Discussion in the unpublished portion of the majority opinion: Sorrels's Appeal—parts I., II., III., and IV.; Jenkins's Appeal—parts I., II.B., III., IV., V., VI. only; and Garrett's Appeal—parts I., II. and III. I write separately to express my view that the trial court overstepped its bounds in detailing the prosecution's case to the panel of prospective jurors. For that reason, I do not agree with the majority's analysis in part II.A. of Jenkins's appeal. However, I acknowledge that the error was harmless.

"Jurors rely with great confidence on the fairness of judges, and upon the correctness of their views expressed during trials." (*People v. Sturm* (2006) 37 Cal.4th 1218, 1233 [39 Cal.Rptr.3d 799, 129 P.3d 10] (*Sturm*).) As Justice Stanley Mosk wrote in his dissent in *People v. Proctor* (1992) 4 Cal.4th 499 [15 Cal.Rptr.2d 340, 842 P.2d 1100] (*Proctor*): "A judge must, of course, cleave fast to the judicial role and not adopt that of an advocate. . . . [¶] . . . ' "The influence of the trial judge on the jury is necessarily and properly of great weight," . . . and jurors are ever watchful of the words that fall from him.' (*Bollenbach* v. *United States* (1946) 326 U.S. 607, 612 [90 L.Ed. 350, 66 S.Ct. 402].)" (*Proctor, supra,* at p. 563, citations omitted (dis. opn. of Mosk, J.).) Comments from the court should be made "with great care" (*People v. Rincon-Pineda* (1975) 14 Cal.3d 864, 886 [123 Cal.Rptr. 119, 538 P.2d 247] [com. on evidence]), and "with wisdom and restraint" (*People v. Shannon* (1968) 260 Cal.App.2d 320, 331 [67 Cal.Rptr. 207] [com. on evidence]). " 'The propriety and prejudicial effect of a particular comment are judged both by its content and by the circumstances in which it was made.' [Citation.]" (*People v. Linwood* (2003) 105 Cal.App.4th 59, 73 [129 Cal.Rptr.2d 73] [com. to clarify which acts referred to which counts].)

Notwithstanding these words of caution, I recognize that article VI, section 10 of the California Constitution authorizes the court to "comment on the evidence and the testimony and credibility of any witness" to assist the jury in reaching a just verdict. (See Pen. Code, §§ 1093, subd. (f), 1127; *Sturm, supra,* 37 Cal.4th at p. 1232; *People v. Rodriguez* (1986) 42 Cal.3d 730, 766 [230 Cal.Rptr. 667, 726 P.2d 113].) The rule applies equally to judicial comments made during jury selection. (*Sturm, supra,* at p. 1232.) But the trial court's power to comment on the evidence has strict limitations. Its comments " 'must be accurate, temperate, nonargumentative, and scrupulously

fair.' [Citation.]" (*Ibid.*) " 'The trial court may not, in the guise of privileged comment, withdraw material evidence from the jury's consideration, distort the record, expressly or impliedly direct a verdict, or otherwise usurp the jury's ultimate factfinding power. [Citations.]' [Citations.]" (*Proctor, supra,* 4 Cal.4th at p. 542 (maj. opn.).)

*Sturm, supra,* 37 Cal.4th 1218, is instructive. In that case, the defendant was convicted of first degree felony murder with special circumstances; the jury made no finding as to deliberate and premeditated first degree murder. After the jury could not reach a penalty verdict, a mistrial was declared. (*Id.* at p. 1222.) Although the first jury did not find the murders premeditated, the trial court told a prospective panel of jurors for the second penalty trial that premeditation was a "gimme" and that the issue of premeditation was " 'all over and done with.' " (*Id.* at p. 1231, italics omitted.) Our Supreme Court reversed the death sentence. It reasoned that, not only were the comments factually incorrect, they bolstered the prosecution's case and undercut the defendant's argument that lack of premeditation was a factor in mitigation. (*Id.* at p. 1232.)

I do not mean to suggest that the comments the trial court made here are anywhere near as egregious as what happened in *Sturm.* I have no doubt the trial court believed that he was assisting the jury in understanding the facts that likely would be adduced at trial. I certainly agree that the court's recitation in the voir dire process of the key events of a criminal prosecution may provide context for the questions put to the jury and may ferret out any information that a juror may have about a case or a juror's bias. I note the efforts the trial court made to state that what it was about to describe was only the prosecution's theory of the case, and that the defense disputed the prosecution's contentions.

Nevertheless, I see serious problems with the court's remarks and they are at least twofold:

1. Only the prosecution's facts are set out. This is not particularly surprising and reflects a reality of criminal procedure. The defense does not have the burden of proof, counsel may not put on a defense, counsel may not decide whether to make an opening statement until much after voir dire has been completed. Thus, statements such as the one made by the trial court will almost always be from solely from the prosecution's perspective.

2. The individual factual statements are not immediately preceded by a warning that they are only the prosecution's contentions. Seven paragraphs appear on their face to be facts, all supporting the prosecution's case. For example, the sixth paragraph on page 1163 of the majority opinion states,

in part: " 'The Escalade then drove forward. The Chevy Trailblazer pulled up next to the Astrovan, and the front passenger fired a small caliber handgun into the Astrovan.' "

Much earlier, the court advised the jury that what he was about to say were only contentions, but whether the jury took this statement (or others) as true—forgetting or not understanding "contentions"—cannot be ascertained with any degree of certainty.

I agree there is room for the trial court to advise a jury in a neutral way what the case is about: the charges, where key events took place, some rudimentary identifying information about the people involved. In the present case, in my view, the court went too far. The repetition of what was in effect the prosecution's opening statement by the trial court raises the considerable concern that by the time the jurors had heard the evidence, they were so inured to the prosecution's theory that their ability to assess the evidence objectively may have been impaired.

The error notwithstanding, the evidence supporting conviction was overwhelming, so there was no reasonable probability that the trial court's challenged comments affected the verdict. (*People v. Melton* (1988) 44 Cal.3d 713, 736 [244 Cal.Rptr. 867, 750 P.2d 741].)

Petitions for a rehearing were denied September 18, 2012, and the opinion was modified to read as printed above. Appellants' petitions for review by the Supreme Court were denied November 28, 2012, S205601.