Filed 5/19/15  P. v. Solvey CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>STANLEY H. SOLVEY,<br><br>    Defendant and Appellant. | B255080<br><br>(Los Angeles County<br>Super. Ct. No. SA083379) |

APPEAL from a judgment of the Superior Court of Los Angeles, Leslie E. Brown, Judge.  Affirmed.

Gideon Margolis, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Victoria B. Wilson and Theresa A. Patterson, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Stanley H. Solvey appeals from the judgment entered following his conviction by a jury of robbery and attempted robbery. Solvey, who contended at trial he was in a blackout state due to side effects of prescribed medicine when he committed the crimes, argues the trial court committed prejudicial misconduct by belittling his expert witness on toxicology and abused its discretion when it denied his request on the first day of trial to allow an additional expert witness to testify on his behalf. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Information*

Solvey was charged by information with one count of second degree robbery (Pen. Code, § 211) (count 1),[1] one count of attempted second degree robbery (§§ 644, 211) (count 2), one count of use of a facsimile weapon of mass destruction (§ 11418.1) (count 3) and one count of threatening to use a weapon of mass destruction (§ 11418.5, subd. (a)) (count 4). The information specially alleged Solvey had suffered three prior serious or violent felony convictions within the meaning of the three strikes law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)) and four prior serious felony convictions as defined by section 667, subdivision (a), and had served four separate prison terms for felonies (§ 667.5, subdivision (b)). Solvey pleaded not guilty as well as not guilty by reason of insanity and denied the special allegations. Counts 3 and 4 were dismissed before trial.

2. *Summary of the Evidence Presented at Trial*

    a. *The People's case*

        i. The bank robberies

During the afternoon of February 12, 2013 David Gonzales, a bank teller, was greeting customers in the lobby of the Chase bank located on Venice Boulevard in Mar Vista. Solvey entered the bank wearing a wig and a long-sleeved shirt. He walked quickly—neither staggering nor stumbling—to the teller line, carrying a binder and a square object resembling a lunch pail.

---

[1] Statutory references are to this code unless otherwise indicated.

Gonzales noticed a line was developing and returned to his teller window. When Solvey arrived at the window, he removed a typewritten note from the binder and gave it to Gonzales. The note read, "This is a robbery. There's a bomb in the drinking vessel. Dynamite sticks. I also have a handgun. Follow the instructions and no one will get hurt. No dye packs and no activating alarms while I am in this bank. No drama. No boom, boom. Put all the cash from the teller drawer in the manila envelope with this note. . . ." Solvey told Gonzales "to not be a hero" and reiterated, "No silent alarms. No dye packs." Solvey opened the lunch pail, revealing an object that looked like a road flare with wires taped to the ends. Gonzales gave Solvey $2,320, and Solvey walked quickly out of the bank.

Approximately 45 minutes later Solvey entered a West Los Angeles branch of the Bank of America wearing a wig, long-sleeved flannel shirt and reading glasses. Solvey approached Alex Torbatian's window and handed him the same note as the one used during the Chase bank robbery (or a copy of it). Solvey then demanded money and opened a bag containing what looked like a handgun with red tape on it. Torbatian turned around and told his manager and coworker he was being robbed. As Torbatian turned back, Solvey told him not to press the alarm. Torbatian did so anyway, and Solvey walked quickly out of the bank.

ii. Solvey's arrest

On February 23, 2013 Long Beach Police Officer Jacob Dillon was off duty, sitting in a parked car on Linden Avenue in Long Beach. Dillon testified he saw Solvey knocking on the door of a nearby house. He appeared to be talking to someone at the door and was "kind of animated," "moving his arms around." Solvey then ran from the front porch, down the driveway. Dillon thought Solvey's behavior was suspicious, so he drove into the alley behind the house. Dillon saw Solvey climb over a fence into the alley, looking at trash cans and trees. Solvey began walking down the alley toward Dillon, who was on the phone with police dispatch reporting a suspicious person. Solvey took a backpack off the hood of a white truck parked in the alley and kept walking. Dillon drove out of the alley and watched Solvey go into a restaurant.

Antonia Sorto, who answered the door at the Linden Avenue home, testified Solvey told her his son or nephew had thrown something over the fence. Sorto said she would throw it back over the fence when she found it. When she went to the backyard, Solvey was already there looking for something. Sorto told him to leave. Solvey told Sorto not to be scared if she found the item because, although it looked like a bomb, it was not going to explode. Sorto called the police.

Long Beach Police Officer Anthony Garcia responded to the suspicious person call placed by Officer Dillon. Garcia detained Solvey after he left the restaurant bathroom. While Garcia was obtaining general information from Solvey, Solvey volunteered he had permission to be at the residence and was looking for a device that looked like a bomb. During a search of Solvey's backpack, officers found a few long-sleeved shirts, a white hat, sunglasses and a folder with a note that read, "Follow instructions and no one will get hurt. There is a bomb in the bag. No alarms and no dye packs. Put all the money in the bag."

Long Beach Police Officer Jorge Grajeda, who had assisted Garcia during Solvey's detention, testified he subsequently went to the Linden Avenue residence to look for suspicious items. Grajeda found a device that looked like a bomb in one of the trashcans in the alley. The device turned out to be road flares with cables attached to them.

### iii. Laura Osuna's testimony

Laura Osuna testified she and Solvey were in a romantic relationship from 2010 through January 1, 2012. After their relationship ended, Solvey and Osuna remained friends. They were together for two days before the robberies occurred, and Solvey had acted normally.

On February 11, 2013 Osuna bought Solvey a cheap wig as a joke. The two had previously talked about Solvey purchasing a wig from a professional wig shop to cover a large tattoo on the back of his head.

At noon on February 12, 2013 Osuna rented a car for Solvey, and the two returned to Osuna's home. Solvey left about an hour or two later. He was acting normally and did

4

not seem in a rush to leave. When Solvey returned in the early evening, he was coherent and agitated, but "nothing too out of the ordinary." He said he needed the car another day and gave Osuna $300 in small bills. Solvey left at 11:00 p.m., and Osuna did not see him again until the next evening. At that point, he was acting erratically.

Osuna, who had worked in psychiatric facilities with schizophrenic and psychotic adults, testified Solvey had told her he suffered from schizophrenia; but she did not believe him until she saw him talking to himself, as well as to mirrors and people who were not there. Osuna did not recall ever seeing Solvey black out, but he had told her on several occasions that "he had lost some days or up to a week." Solvey did not complain to Osuna about blacking out on February 12, 2013. Osuna also testified she had never seen Solvey have a seizure or hear him complain about seizures.

b. *The defense's case*

Solvey represented himself at trial and was permitted to testify in a narrative fashion. He also introduced testimony from two expert witnesses.

i. Solvey's testimony

Solvey testified he had been diagnosed with schizophrenia when he was 15 years old. He is able to function and deal patiently with his symptoms when he takes medication. When he does not take medication, he hallucinates, hears voices and has "little meltdowns" during which he talks to himself and wanders off. This happens once or twice a year. Solvey has also suffered from seizures ever since he contracted an illness in 2005. He experiences convulsions that last two to five minutes followed by a state of confusion lasting from five to 30 minutes. Solvey does not recall events that occur during that period.

Solvey takes medication to control his seizures. Solvey had been obtaining his medication in Los Angeles until he moved to Mexico in the fall of 2013. While in Mexico Solvey's insomnia and seizures became worse, so he asked a doctor to prescribe something stronger than the Benadryl he had been taking for insomnia. The doctor prescribed flunitrazepam (Rohypnol).

5

Solvey, a part-time tattoo artist, testified he asked Osuna to rent him a car on February 12, 2013 because he had a tattoo appointment in Apple Valley and did not want to drive there on his motorcycle. He took a Rohypnol at about 2:00 a.m. on February 12, 2013 before he went to sleep. He was groggy when he awoke the next morning and took some medication, but was not sure what it was because he did not have his reading glasses. When Solvey and Osuna returned from renting the car, he was having problems with his motor control and thought he was about to have a seizure. After waiting approximately 10 minutes with no seizure, Solvey was confident he could drive and took "a light seizure nerve medication."

Solvey drove to his son's house to get his tattoo equipment and print out designs. While he was there, he had a seizure and lost consciousness. When he awoke, the contents of his backpack were on his lap, and his medication bottles were out. He did not recall taking additional medication. He began hallucinating about a war between China and Japan. The next thing Solvey remembered was standing in an alley near the car with the road flare device sitting on the hood. He threw the device over an arch. He then saw a backpack that was not his and, thinking he was in trouble, threw it over a wall. He recalled driving out of the alley, but remembered nothing else until he parked a few blocks from Osuna's house. He had $2,000 in his pocket, but did not recall how he got it or giving Osuna $300.

With respect to his actions the day of his arrest, February 23, 2013, Solvey explained he returned to where he had thrown the road flare device to verify it was not a bomb and to be held accountable for whatever he had done. Solvey testified he was in a complete blackout for at least four hours on the day of the robbery. He did not intend to rob a bank that day. Moreover, he did not know flunitrazepam was illegal in the United States or the side effects of the medication he had taken to control his seizures.

                              ii. Dr. Back-Madruga's testimony

Dr. Carla Back-Madruga, a clinical psychologist specializing in neuropsychology, reviewed Solvey's medical records and evaluated him on July 1, 2013. Dr. Back-Madruga testified the most prominent psychiatric disorders with which Solvey had been

6

diagnosed were schizophrenia and schizoaffective disorder, both characterized by hallucinations and delusions. Solvey was also diagnosed in 2006 with a partial complex seizure disorder.

After administering a number of tests, Dr. Back-Madruga opined Solvey's IQ was average and his performance on achievement tests was within normal limits at about a high school grade level equivalent. Solvey, however, had moderate impairment in several aspects of executive function, including cognitive flexibility and his ability to inhibit impulsive responding. Dr. Back-Madruga concluded Solvey's test scores were credible and he was not feigning or exaggerating his cognitive impairment.

During cross-examination Dr. Back-Madruga testified she saw a notation in records from Patton State Hospital indicating Solvey had sniffed paint and could not recall what had happened in connection with a previous arrest in 2001. She also testified Solvey was capable of conceiving a plan and executing it, but it may not be a reasonable plan. Solvey did not tell Dr. Back-Madruga he had had blackouts or mention he had taken flunitrazepam.

### iii. Dr. Rody Perdescu's testimony and the court's questions that are the basis of Solvey's prejudicial misconduct contention

Dr. Rody Perdescu, an expert in forensic toxicology, reviewed Solvey's medical records and interviewed him. Dr. Perdescu testified flunitrazepam is a hypnotic, sedative anticonvulsant used to treat seizures, chronic insomnia and depression. Although the drug is a depressant for the central nervous system, paradoxically an "individual can become aggressive, lose control, and can also commit criminal crimes." Because it is a long-acting drug, people who take it may experience a residual hangover effect, including sleepiness and impaired psychomotor or cognitive functioning for a day or more after taking it. The drug can also cause retroactive amnesia, akin to "a blackout." Although flunitrazepam is not available in the United States, it is available in other countries including Mexico. Dr. Perdescu described it as "one of the most effective drug[s] to treat insomnia." Some medications, when taken with flunitrazepam, increase its side effects.

During cross-examination, Dr. Perdescu agreed side effects of flunitrazepam may include slurred speech and poor coordination and motor skills. After Dr. Perdescu was shown a short video of Solvey approaching the bank teller during one of the robberies, she testified she could not determine whether Solvey showed any signs of impairment from having taken flunitrazepam. She further explained, "It's a very short video. So I don't know. I know the [flunitrazepam], the next day the person can walk, can talk and do certain things and not recall. Everybody saw the 'Hangover' movies when those people when they saw on their video what they've done, and the people that don't have any violent behavior, they couldn't even believe it was exposed themselves. [*sic*]And they all did those things without knowing what they've been doing." The court then asked, "Hold on. So the 'Hangover' movie is a source of authority for your opinions here? Is that what you are saying?" Dr. Perdescu replied, "No, no. I was just making an analogy, that's all. But I cannot say looking through those videos . . . if he was impaired or not."

After the prosecutor finished cross-examining Dr. Perdescu, the court asked Dr. Perdescu to describe the outwardly observable characteristics of an individual who had just taken flunitrazepam. As the court was attempting to differentiate between the immediate effect of the drug and the effect after several hours and clarify Dr. Perdescu's testimony that a person would "pretty much [go] to sleep," Solvey asked if he could object. The court admonished Solvey for interrupting it, but subsequently permitted him to voice his objection. Solvey argued, "Prejudicial and judicial misconduct, your Honor. This was highly, highly prejudicial to my witness. . . . You took her on voir dire that counsel could have easily taken care of . . . ." The court indicated it would address Solvey's objection outside the presence of the jury and later overruled it, explaining the court was entitled to examine witnesses to the extent it deemed appropriate to ascertain the truth. In making a further record Solvey contended the court had "talk[ed] down to the witness in a very loud voice." The court disputed Solvey's characterization of its questioning.

8

3. *The Verdict and Sentence*

The jury convicted Solvey of attempted robbery and robbery. In a subsequent proceeding the jury found Solvey was sane when he committed the crimes. After Solvey admitted two prior strike convictions and three prior serious felony convictions, the trial court sentenced him to an aggregate state prison term of 65 years to life.

**DISCUSSION**

1. *The Court Did Not Commit Prejudicial Misconduct When It Asked*
*Dr. Perdescu Whether "The Hangover" Was Authority for Her Opinion*

Solvey contends the trial court committed prejudicial misconduct by belittling Dr. Perdescu when it asked if her expert opinion was based on the motion picture The Hangover (Warner Bros. (2009)). This claim has been forfeited and in any event lacks merit.

The due process clause of the Fourteenth Amendment requires a fair trial in a fair tribunal before a judge with no actual bias against the defendant or interest in the outcome of the case. (See *Bracy v. Gramley* (1997) 520 U.S. 899, 904-905 [117 S.Ct. 1793, 138 L.Ed.2d 97].) Judicial misconduct occurs when a trial judge strongly suggests to the jury he or she disbelieves the defendant's case or otherwise favors the prosecution. (See *Liteky v. United States* (1994) 510 U.S. 540, 555-556 [114 S.Ct. 1147, 127 L.Ed.2d 474]; see *People v. Houston* (2012) 54 Cal.4th 1186, 1219 ["court commits misconduct if it creates the impression that it is denigrating the defense or otherwise allying itself with the prosecution"].) To violate a defendant's right to a fair trial, the judge's intervention must be significant and adverse to a substantial degree. (See *McBee v. Grant* (6th Cir. 1985) 763 F.2d 811, 818; see also *Duckett v. Godinez* (9th Cir.1995) 67 F.3d 734, 740.)

In *People v. Sturm* (2006) 37 Cal.4th 1218 (*Sturm*) the Supreme Court summarized the California standard for judicial misconduct: "'[T]he court has a duty to see that justice is done and to bring out facts relevant to the jury's determination.' [Citation.] . . . However, 'a judge should be careful not to throw the weight of his judicial position into a case, either for or against the defendant.' [Citation.] [¶] Trial judges 'should be exceedingly discreet in what they say and do in the presence of a jury

9

lest they seem to lean toward or lend their influence to one side or the other.' [Citation.] A trial court commits misconduct if it '"persists in making discourteous and disparaging remarks to a defendant's counsel and witnesses and utters frequent comment from which the jury may plainly perceive that the testimony of the witnesses is not believed by the judge."'" (*Id.* at pp. 1237-1238.)

Solvey has forfeited his judicial misconduct claim because he failed to object and request a curative instruction when the court asked Dr. Perdescu if she was relying on The Hangover as authority for her opinions. (See *Sturm, supra,* 37 Cal.4th at p. 1237 ["[a]s a general rule, judicial misconduct claims are not preserved for appellate review if no objections were made on these grounds at trial"].) Solvey's subsequent objection to the court's limited examination of Dr. Perdescu—primarily based on the timing of the examination and the court's failure to allow Solvey to elicit the information from Dr. Perdescu—did not reasonably encompass an objection to the court's earlier question about The Hangover.

Even if not forfeited, however, the claim lacks merit. There was nothing improper about the question on its face. With the proliferation of forensic and crime-based television shows and films, it is not an unreasonable concern that juries might be influenced by media portrayals of issues that may be germane to a defendant's guilt or innocence. In ascertaining Dr. Perdescu's opinion was not actually based on The Hangover after she had mentioned it during her testimony, the court acted well within its discretion, and, if anything, likely bolstered her credibility. Indeed, Solvey had also referred to the film in his opening statement, contending, "[A]s silly as it sounds, it's like 'Hangover' one where the guys ingest a medication on the roof and they go around town that night doing a bunch of things they would not have normally have done and wake up the next morning with no recollection of what they have done. In a complete blackout the whole night." With two references to The Hangover, the court was justified in inquiring about the relationship between the film's storyline and Dr. Perdescu's expert

testimony.[2]  Moreover, even if the question as articulated was somehow inappropriate because of the court's tone of voice—a characteristic impossible to determine by reviewing a transcript on appeal—a single improper question in the context of this trial does not constitute the kind of significant intervention required to find judicial misconduct that deprived a defendant of a fair trial.  (See *People v. Houston*, *supra*, 54 Cal.4th at p. 1221 ["[e]ven if improper, these two brief remarks '"fall short of the intemperate or biased judicial conduct [that] warrants reversal"'"].)

2. *The Trial Court Did Not Abuse Its Discretion in Denying Solvey's Request to Call a Third Expert Witness*

a. *Relevant proceedings*

At the outset of trial Solvey and the prosecutor estimated trial would take 10 days. During the ensuing review of witness lists, Solvey requested permission to present the testimony of a neurologist, Dr. Shapiro, who had not been identified on his witness list, "to clear up some complex issues such as seizures."  In response to the court's question why Solvey had waited until the day of trial to identify Dr. Shapiro, Solvey explained, "[W]ith further discussions with both of my experts, the toxicologist and the neuropsychologist, it became evident that I would need a . . . neurologist to simply give light as to the type of seizures there are and the type of symptoms and signs that come from those seizures.  For instance, it could be complex to the jury, focalized seizures and generalized seizures, and the difference between the two of them and the type of reaction that somebody would have and the type of consciousness that somebody would have under those seizures.  It's very relevant to the case.  It's not a material issue as to the truth of the matter or not, it's just to clear up some of the testimony that will be heard from . . . myself, and to show the jury the complexities that are beyond my scope and expertise [and] beyond the scope and expertise of my two witnesses."

The court denied Solvey's request, finding it was untimely, would undermine judicial economy by adding a half day of testimony to an already lengthy trial and would

---

2    Dr. Perdescu later testified Solvey had not mentioned the film to her and it was merely a coincidence they had both referred to it.

be prejudicial to the People, who had not had time to prepare to cross-examine a new expert witness. The court cited Evidence Code section 352 and "any other appropriate and applicable Evidence Code or procedural code that this is untimely." Solvey contends this ruling constituted prejudicial error.

>### b. *Governing law and analysis*

"Only relevant evidence is admissible at trial. (Evid. Code, § 350.) Under Evidence Code section 210, relevant evidence is evidence 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' A trial court has 'considerable discretion' in determining the relevance of evidence." (*People v. Merriman* (2014) 60 Cal.4th 1, 74.) Similarly, the court "has broad discretion to exclude relevant evidence under Evidence Code section 352 'if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' [Citations.] Such 'discretion extends to the admission or exclusion of expert testimony.' [Citations.] We review rulings regarding relevancy and Evidence Code section 352 under an abuse of discretion standard." (*People v. Linton* (2013) 56 Cal.4th 1146, 1181.) "We will not reverse a court's ruling on such matters unless it is shown '"the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice."'" (*Merriman*, at p. 74.)

The trial court did not abuse its broad discretion in denying Solvey's request to call Dr. Shapiro whose proposed testimony explaining the type of seizures Solvey experienced was tangential to the case at best. The central issue presented by Solvey's defense was whether the flunitrazepam Solvey claimed he had taken caused an extended blackout period during which Solvey was able to plan and attempt to commit two robberies without actually having the intent required for those crimes—the subject addressed by Dr. Perdescu. Balancing the marginal relevance of Dr. Shapiro's proposed testimony regarding seizures against the prejudice to the People from Solvey's failure to

12

timely identify the expert and the amount of time it would add to the already lengthy trial, the court's ruling to exclude Dr. Shapiro was not arbitrary, capricious or patently absurd.

Solvey contends it was improper for the trial court to exclude Dr. Shapiro under Evidence Code section 352 because the People failed to object on those grounds in the trial court. As Solvey argues, generally, "'[t]he *sine qua non* for invoking the protection of Evidence Code section 352 is a request at the trial level that the court exercise its discretion.'" (*People v. Burns* (1987) 196 Cal.App.3d 1440, 1455.) However, "[t]hat is not to say that the court cannot exclude improper evidence on its own motion. (Evid. Code, § 765.) When appropriate, the court has the same power to act on its own initiative without waiting for an objection." (*Gherman v. Colburn* (1977) 72 Cal.App.3d 544, 581.) That is precisely what happened in the instant case.

## DISPOSITION

The judgment is affirmed.


PERLUSS, P. J.

We concur:


ZELON, J.


STROBEL, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

13