Filed 3/4/26  Dickerson v. Bickman CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| BIANCA A. DICKERSON et al., | B333003 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC617242) |
| v. | |
| TRISTAN EMILY BICKMAN et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ruth Ann Kwan, Judge.  Affirmed.

Tamari Law Group and Robert W. Wright for Plaintiffs and Appellants.

La Follette Johnson Dehaas Fesler & Ames, Christopher P. Wend and Jeffrey A. Rector for Defendant and Respondent Tristan Emily Bickman.

Cole Pedroza, Kenneth R. Pedroza, Cassidy C. Davenport; Fraser Watson & Croutch, Stephen C. Fraser, Evan A. Guzé, and Daniel K. Dik for Defendants and Respondents The Regents of The University of California and Christopher Tarnay.

———————————————

Plaintiffs Bianca Dickerson and Taly Williams appeal the judgment entered in favor of defendants Tristan Emily Bickman, M.D., Christopher Tarnay, M.D., and the Regents of the University of California (the Regents) following trial.

Dickerson gave birth at a medical center operated by the Regents. Williams is Dickerson's husband and the child's father. Bickman delivered the baby. Dickerson suffered chronic pain after the delivery. She had three appointments with Tarnay concerning her postpartum pain. Plaintiffs asserted causes of action for medical malpractice and loss of consortium against all defendants. They also asserted a cause of action for fraud against Bickman, alleging that Bickman intentionally misrepresented and concealed the extent of Dickerson's birthing injuries. The trial court granted Bickman's motion for nonsuit as to the fraud cause of action but did not withdraw the issue of concealment from the jury. The jury returned a verdict in favor of defendants.

On appeal, plaintiffs contend the trial court reversibly erred by calling plaintiffs' attorney unprepared on one or two occasions, improperly denying plaintiffs leave to amend their complaint before and during trial, and excluding two of plaintiffs' witnesses. We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

Dickerson gave birth to her second child on May 5, 2015, at Santa Monica UCLA Medical Center, which the Regents own and operate. Bickman, Dickerson's obstetrician and gynecologist (OBGYN), attended the birth and delivered plaintiffs' child.

After Dickerson arrived at the hospital, she received an epidural and was numb from the waist down. While Dickerson was in labor, a nurse bent her legs into the birthing position. The nurse who was supporting Dickerson's left leg "inadvertently looked away, and when she looked away, she removed her body and her hand." Dickerson's left leg then dropped onto or slid down the mattress from a bent position. Dickerson felt a "really sharp pull in [her] right rib cage." Bickman noticed the leg was down and instructed the nurse to " 'get [Dickerson's] leg up.' " Dickerson did not testify that she alerted any medical provider of the sensation she experienced as a result of the leg drop.

After the delivery, Bickman repaired sulcal (vaginal wall) and perineal lacerations Dickerson sustained during childbirth. Dickerson reported severe pain in her vagina and rectum while in the hospital. She received pain medications. According to hospital records, Dickerson was not in pain when she was discharged on May 7, 2015.

However, Dickerson continued to experience pain after she was discharged. A week after the birth, Dickerson's primary care physician referred her to Tarnay because she appeared to want a second opinion as to whether she was healing properly. Tarnay is an OBGYN specializing in urogynecology, or the treatment of

---

[1] Because plaintiffs do not challenge the sufficiency of the evidence supporting the jury's verdict, we only briefly discuss the facts.

pelvic floor disorders in women.  Dickerson had three visits with Tarnay.  Tarnay diagnosed Dickerson with postpartum perineal pain, tenderness in her pelvic muscles, a nerve pain issue, and increased sensitivity.  Tarnay recommended a conservative course of treatment and indicated that Dickerson might need perineal revision surgery if conservative measures proved suboptimal.  Dickerson also continued to see Bickman until September 11, 2015.

In May 2016, Dickerson underwent surgery with another doctor.  This surgery, along with physical therapy, alleviated some of her pain.  However, Dickerson continued to suffer from chronic pain.  She testified that as a result of the pain, her close relationship with her children and her marriage were "destroyed."  She also had difficulty maintaining employment.

***Plaintiffs' Complaint***

Plaintiffs filed this lawsuit in April 2016.  The operative third amended complaint asserted causes of action for medical malpractice and loss of consortium against all defendants, and fraud against Bickman on theories of intentional misrepresentation and fraudulent concealment.

In October 2020, plaintiffs sought leave to file a fourth amended complaint to assert a claim of fraud against the Regents based on information they had become aware of "in or around December 2017."  In April 2021, the trial court denied the request.

***Trial***

The approximately five-week trial began on January 17, 2023.  Plaintiffs called 17 witnesses in their case in chief, including 11 retained expert witnesses and three medical professionals who had treated Dickerson.  After plaintiffs rested

4

their case, Bickman moved for nonsuit on all causes of action asserted against her. Initially, the court denied the motion for nonsuit with respect to the medical negligence and the loss of consortium causes of action. The court later granted Bickman's motion for nonsuit on the intentional misrepresentation theory of fraud.[2]

Subsequently, on February 16, 2023, the case was submitted to the jury. The following day, the trial court granted Bickman's motion for nonsuit as to the fraudulent concealment theory but did not withdraw the issue from the jury's consideration. Following the court's ruling on the motion for nonsuit, plaintiffs moved to conform their complaint to proof at trial. The court denied the request.

The jury returned its verdict on February 21, 2023. It found that none of the defendants had been negligent for purposes of medical malpractice and Bickman had not intentionally failed to disclose any facts.

In July 2023, plaintiffs moved for a new trial. The trial court denied the motion. Plaintiffs timely appealed.

## DISCUSSION

### I. The Trial Court Did Not Commit Misconduct By Commenting on Counsel's Preparedness Outside the Presence of the Jury

Plaintiffs contend the trial court committed misconduct when it reprimanded their attorney for being unprepared. The court made the comment in chambers. However, Dickerson

---

[2] Although intentional misrepresentation and fraudulent concealment were alleged as part of the same fraud cause of action, the trial court deemed them "two different theor[ies]" and considered them separately.

5

stated in her declaration that the comment was "clearly heard in the courtroom." We conclude that plaintiffs forfeited their claim of judicial misconduct by failing to raise it below. Even if not forfeited, the court's statements did not constitute judicial misconduct.

### A.    Applicable legal standards

A trial court commits misconduct if it " 'persistently makes discourteous and disparaging remarks' " to counsel for one of the parties, thus creating the impression that " 'it is allying itself' " with the other party. (*People v. Sturm* (2006) 37 Cal.4th 1218, 1233 (*Sturm*).) "[I]t is critical for a litigant who believes a trial court is engaging in such misconduct to object immediately, thereby putting the court on notice of the need to correct its behavior and creating a record of the problem for appellate review." (*Arave v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (2018) 19 Cal.App.5th 525, 543 (*Arave*).)

"It is 'extraordinary' for an appellate court to find judicial bias amounting to a due process violation. [Citation.] The appellate court's role is not to examine whether the trial judge's behavior left something to be desired, or whether some comments would have been better left unsaid, but to determine whether the judge's behavior was so prejudicial it denied the party a fair, as opposed to a perfect, trial." (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 589.)

### B.    Plaintiffs' claim of judicial misconduct was forfeited and is without merit

Plaintiffs concede that they failed to object to the trial court's purported statements during trial. Although they claim their attorney "did not and could not know at the time that the judge was overheard by the jurors in the courtroom," Dickerson

6

stated in her declaration that the court's comments were "clearly heard" in the courtroom. Assuming Dickerson was able to make this statement under penalty of perjury because she personally heard the court's comments, there is no reason why she could not have raised this with her attorney in a timely manner. Plaintiffs' willingness to let the trial continue without objecting on the ground of bias forfeits their claim on appeal and strongly suggests it is without merit. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1112 (*Guerra*).)

Citing *People v. Seumanu* (2015) 61 Cal.4th 1293, plaintiffs assert that any objection would have been futile. They offer no analysis in support of this contention, and *Seumanu* belies their claim. In *Seumanu*, our Supreme Court concluded the defendant's failure to object at trial forfeited any claim of judicial misconduct based on the trial judge's single comment. (*Id*. at p. 1320.) It rejected the defendant's claim that an objection would have been futile, since "the circumstances in no way suggest[ed] an objection and a request to have the jury admonished would have found an unsympathetic jurist." (*Ibid*.) The same is true here.

Even if plaintiffs did not forfeit the claim, we would find no judicial misconduct here. The trial court made a single statement in chambers that plaintiffs' counsel was "unprepared." A trial court may properly reprimand attorneys for improper conduct, such as a failure to be prepared at trial, and may even do so harshly. (*Guerra, supra*, 37 Cal.4th at p. 1111.) Plaintiffs do not establish that the reprimand was unwarranted. Although Dickerson claimed the court also made "[s]imilar statements" in chambers approximately a week before, she did not describe these other statements in any detail. Plaintiffs also did not

7

submit any juror declarations establishing that members of the jury heard these comments or understood they were addressed to plaintiffs' attorney.[3]

Moreover, even if unwarranted or improper, two such comments during a month-long trial do not constitute "persistent" misconduct and did not render plaintiff's trial unfair. (See *Arave, supra,* 19 Cal.App.5th at p. 539 [trial court did not commit misconduct when it chastised attorney for reading from documents when questioning witnesses on three occasions; incidents were "extremely minor" and, "[a]t worst, . . . expressions of frustration at counsel's use of trial time"]; see *id.* at pp. 537–538.) "As our Supreme Court has indicated, 'manifestations of friction between court and counsel, while not desirable, are virtually inevitable in a long trial.' " (*Id.* at p. 539, quoting *People v. Snow* (2003) 30 Cal.4th 43, 78–79.)

Plaintiffs rely on *Sturm, supra,* 37 Cal.4th 1218, to support their claim that the court's comments called its neutrality into question. The circumstances here are plainly distinguishable. In *Sturm,* the trial court belittled the defendant's expert witnesses, answered questions on an expert's behalf, disparaged defense counsel in the presence of the jury, interposed its own objections to his questions, and stated it had spent " 'an inordinate amount

---

[3] The trial judge found that it was not clear that the jury could hear her comments. She described the courtroom for the record. It is approximately 45 feet wide with an "extremely high ceiling." The court's chambers are "literally to the very end of the other side of the courtroom from the jury." There is an outer door to chambers, followed by a seven foot hallway, and an inner door. The outer door is always closed during discussions in chambers. The trial court also noted there were "always about six attorneys" present in chambers.

of time' " ruling on objections to defense counsel's questions.  (*Id*. at p. 1236, italics omitted; see *id*. at p. 1233–1236.)  Our Supreme Court concluded the trial court's comments indicated that it did not take the defense experts seriously, it was allied with the prosecution, and it believed defense counsel was wasting the court's and the jury's time.  (*Id*. at p. 1238–1240, 1242.)  The cumulative effect of the trial judge's conduct required reversal.  (*Id*. at p. 1243.)

Here, the trial judge's brief, isolated comments, made outside the jurors' presence (if not outside their range of hearing), are not comparable to any single act of the trial court in *Sturm*, much less the sum of that court's conduct.  There was no judicial misconduct.

## II. The Trial Court Did Not Abuse Its Discretion or Commit Prejudicial Error by Denying Plaintiffs Leave To Amend the Complaint

Plaintiffs contend the trial court abused its discretion by denying their pretrial request for leave to amend their complaint to assert a fraud cause of action against the Regents.  They also argue the court erred in denying their request to amend the concealment cause of action against Bickman to conform to proof at trial.  We find no basis for reversal.

### A. Legal principles

Generally, trial courts "will liberally allow amendments at any stage of the proceeding."  (*Falcon v. Long Beach Genetics, Inc.* (2014) 224 Cal.App.4th 1263, 1280.)  But this policy of liberality " 'should be applied only "[w]here no prejudice is shown to the

adverse party . . . ." [Citation.]' [Citation.]" (*Atkinson v. Elk Corp.* (2003) 109 Cal.App.4th 739, 761.)

"A long unexcused delay may be the basis for denying permission to amend pleadings [citations], especially where the proposed amendment interjects a new issue [citations], which may require further investigation or discovery procedures [citations]." (*Nelson v. Specialty Records, Inc.* (1970) 11 Cal.App.3d 126, 139.) Leave to amend is addressed to the sound discretion of the trial court. (*Branick v. Downey Savings & Loan Assn.* (2006) 39 Cal.4th 235, 242.)

## B.     Plaintiffs' pretrial motion for leave to amend
### i.     Background

The operative third amended complaint asserted a cause of action of fraud against Bickman only. It alleged that Bickman intentionally concealed that she had performed an episiotomy on Dickerson and further concealed the true extent of Dickerson's injuries, "i.e., that it was a 4th degree episiotomy and laceration."

In October 2020, plaintiffs sought leave to file a fourth amended complaint. Their motion asserted that plaintiffs had become aware of information suggesting the Regents had also committed fraud "in or around December 2017," and they only learned that the claim may be viable after consulting with their current attorney. The motion did not identify the proposed allegations against the Regents in any detail, nor did it disclose that the proposed amended complaint also altered the allegations concerning Bickman.

The proposed fourth amended complaint alleged that the Regents and its employees intentionally concealed "the anatomical effects of [Dickerson's] leg being dropped"; the nurse employed by the Regents who cared for Dickerson "endorsed the

10

behavior of [Bickman] and remained complicit during and after the injury"; and the Regents concealed that Bickman had performed an episiotomy.  The proposed fourth amended complaint also changed the factual basis of the fraud claim against Bickman, alleging that Bickman told Dickerson she had not suffered a vaginal or perineal laceration of any kind.

In April 2021, the trial court denied plaintiffs' motion.  It first observed that the motion failed to comply with California Rules of Court, rule 3.1324.  The court also concluded that the amendment would be prejudicial because the case was nearly five years old and the modified allegations would require new discovery and motion practice.  Finally, the court noted that plaintiffs had asserted a fraud claim against Bickman "since the outset of this action . . . based on the same facts and circumstances as those in the newly proposed cause of action for fraud."  Yet, plaintiffs failed to "provide a cogent explanation for why this claim was not brought against [the Regents] sooner."

### ii.     Discussion

Plaintiffs do not dispute that their motion for leave to amend did not comply with California Rules of Court, rule 3.1324.  The motion did not identify by reference to page, paragraph, and line number what material plaintiffs had deleted from the previous complaint or what material they added.  (Cal. Rules of Court, rule 3.1324(a)(2)–(3).)  Notably, the motion indicated that the proposed changes to the complaint only concerned the Regents.  It did not disclose that plaintiffs were also seeking to change the factual basis of the concealment claim against Bickman.  This failure to comply with the mandatory requirements of rule 3.1324 provided the court with a reasonable basis to deny the motion.  (See *Hataishi v. First American Home*

11

*Buyers Protection Corp.* (2014) 223 Cal.App.4th 1454, 1469 [trial court did not abuse discretion by requiring plaintiff to file motion for leave to amend "compliant with the Rules of Court"].)

However, the court also concluded that plaintiffs' request was not timely and plaintiffs failed to justify waiting four and a half years to assert a fraud claim against the Regents. Denying the motion on this ground was not an abuse of discretion.

From the inception of the case in April 2016, plaintiffs alleged that Bickman had concealed and misrepresented the extent of Dickerson's injuries. Plaintiffs claimed they were unaware of information suggesting the Regents had similarly committed fraud until December 2017. Yet, even if plaintiffs only learned of the relevant facts in December 2017, they still waited nearly three years to plead a fraud claim against the Regents. The trial court acted reasonably in denying plaintiffs leave to amend in light of plaintiffs' long, unexcused delay in seeking to amend the complaint to plead fraud against the Regents. (*Record v. Reason* (1999) 73 Cal.App.4th 472, 486–487 [no abuse of discretion in denying leave to amend complaint to allege new cause of action where plaintiff was aware of facts supporting new claim almost three years before seeking leave to amend].)

Plaintiffs contend that any cost or burden of additional discovery would have been "minimal." However, the Regents litigated the case for over four years with the understanding that it was a medical malpractice case subject to the damages cap set forth in Civil Code section 3333.2. A fraud cause of action would allow plaintiffs to seek punitive damages, substantially increasing the Regents' potential liability. The trial court could reasonably conclude that both the Regents and plaintiffs would likely seek additional discovery in connection with the fraud

cause of action, and that the costs to the Regents of issuing and responding to this discovery would not be minimal.

**C.    Any error in denying plaintiffs' request to conform the complaint to proof was not prejudicial**

**i.    Background**

The operative complaint alleged that Bickman intentionally concealed that she had performed an episiotomy on Dickerson and concealed the true extent of Dickerson's injuries, "i.e., that it was a 4th degree episiotomy and laceration." It did not allege that Bickman intentionally concealed the leg drop or its effects from plaintiffs.

During opening argument, plaintiffs' attorney asserted that Bickman "failed to disclose the extent of [Dickerson's] injuries, concealing them, failed to disclose the extent of the laceration in her pelvis, [and] the existence of the leg drop and the effect of that leg drop on [Dickerson's] body." He further argued that this concealment prevented Dickerson from understanding her injuries, which resulted in a delay of her diagnosis and "a catastrophic worsening of her condition."

Dickerson testified about her experience of the leg drop and plaintiffs' experts testified that Dickerson sustained hip and nerve injuries as a result of it.

Dickerson also testified that Bickman "concealed and omitted a material fact . . . [by] omitting in her operative reports that [Dickerson] had sustained intrapartum complications, such as dropping of [Dickerson's] leg." She asserted that Bickman "knew the physiology of the body and [she] knew when [Dickerson's] leg was down and the other leg was up that [Dickerson] had been injured." Dickerson testified about the

13

things she would have done differently if she had full information about the leg drop. Williams testified that he believed Bickman concealed "what [Dickerson's] injuries were, the degree of them, that the leg drop had anything to do with anything." He stated that, if the leg drop had been disclosed, "[they] would have got it addressed." Plaintiffs' nursing expert also testified that she believed that the leg drop "was intentionally left out of [Dickerson's] record to avoid any issues and to conceal this information."

Plaintiffs' attorney twice questioned Bickman about the leg drop. Bickman testified that she did not remember anything about Dickerson's delivery eight years prior. She did not remember a leg drop occurring during any patient's delivery and testified that she "probably" would remember if such a thing had happened.

On February 9, 2023, Bickman's counsel argued the court should grant nonsuit on the fraud claim because the evidence at trial did not substantiate the allegations in the complaint. No medical professional testified that Dickerson had undergone an episiotomy or sustained a fourth degree perineal laceration, the theory of fraudulent concealment alleged in the operative complaint. The only expert who testified that the perineal laceration was a third degree laceration, rather than a second degree laceration, was a radiologist. He testified that it would not surprise him if a clinician graded the injury as a second degree laceration as "there can be a difference between what is perceived clinically and what is seen radiologically." Bickman's counsel also asserted the "leg drop" theory of fraudulent concealment was never pled in the complaint. The trial court asked plaintiffs to find case law that supported their claim that

14

they could advance theories of fraud at trial that went beyond the allegations of the complaint.

On February 14, the trial court concluded that the cases plaintiffs had identified did not support their claim that they were allowed to expand their theory of fraud at trial. In response, plaintiffs argued in part that they should be allowed to conform the complaint to proof at trial. The court replied that the complaint should have been amended prior to trial. It granted the motion for nonsuit as to the intentional misrepresentation theory of fraud but deferred ruling on the concealment theory.

On February 16, the trial court instructed the jury that Dickerson was required to prove "that [Bickman] intentionally failed to disclose certain facts, namely, that [Dickerson's] leg drop during her delivery resulted in serious injuries to her, including but not limited to pudendal nerve injury and/or that she suffered a third-degree perineal laceration and that those facts were only known to [Bickman] and that [Dickerson] could not have discovered." In closing argument, plaintiffs' counsel argued that expert witness testimony established "that there was a leg drop, that it was concealed in the medical record, concealed by not being included in the medical records, and that [Dickerson] should not have been allowed to support her legs and her leg to drop, which ultimately wound up causing her injuries." Bickman's counsel challenged plaintiffs' claim that Bickman "concealed that the leg drop caused some heinous injury here." He also repeated the portion of the instruction on fraudulent concealment concerning the leg drop.

The following day, the trial court granted Bickman's motion for nonsuit as to the fraudulent concealment theory. The trial

15

court observed that the theory of concealment presented at trial based on the leg drop was not consistent with the allegations of the operative complaint. Nevertheless, the court considered the leg drop theory when evaluating the fraudulent concealment claim. The court concluded that the evidence, when viewed in the light most favorable to plaintiffs, did not support a finding that Bickman intentionally failed to disclose that the "leg drop" resulted in serious injuries. The court found there was no testimony establishing that "an OB-GYN[ ] somehow should have known[,] or that there's any indication that [Bickman] ha[d] any inkling that that drop onto the mattress of the bed resulted in serious injuries." The court further reasoned that, "[i]f anything, [Dickerson] knew . . . more about the consequences of that leg drop than anybody else did in that room," yet there was "no indication . . . that she told any of the staff about those issues and that associated pain." Without expert testimony to "connect the dot[s]," the court concluded "it would be a complete leap to say that Dr. Bickman . . . intentionally failed to disclose the fact that the leg drop resulted in serious injuries, that Dr. Bickman was even aware of any injuries, let alone serious injury." The trial court also observed that plaintiffs could not prove reliance because "[t]he entire case is about how [Dickerson] immediately embarked on an immediate investigation of her medical condition." The court concluded: "So even if one were to overlook all the specificity issue[s] and the defective pleading, based on the state of the testimony, the court is going to grant the non-suit."

Plaintiffs then formally moved to amend the complaint to conform to proof at trial. Plaintiffs' counsel did not specify the proposed amendments or relevant proof. The court denied the request.

16

Despite granting nonsuit as to the entire fraud cause of action, the trial court did not withdraw the issue of fraudulent concealment from the jury. In the section of the special verdict form titled "Fraud: Concealment," the jury found that Bickman did not "intentionally fail to disclose certain facts that were known only to her and that [Dickerson] did not know and could not reasonably have discovered."

### ii. Discussion

We need not decide whether the court abused its discretion in denying plaintiffs' request to conform the complaint to proof at trial. Even if the court erred, plaintiffs fail to establish that the error had any impact on the outcome of this case.

Although plaintiffs failed to plead the leg drop concealment theory they presented at trial, the trial court fully considered the theory when it ruled on Bickman's motion for nonsuit on the issue. Plaintiffs do not challenge the court's ruling on the motion for nonsuit with respect to concealment or intentional misrepresentation.

Moreover, the jury instructions stated that the leg drop was part of the fraudulent concealment theory. Plaintiffs argued the leg drop theory to the jury as part of the fraudulent concealment claim. Despite the ruling on the nonsuit, the court did not withdraw the issue of fraudulent concealment from the jury. We must therefore presume that the jury considered all of the evidence presented to it, including related to the leg drop. The jury rejected that theory when it found Bickman had not unlawfully concealed any facts from Dickerson, and when it returned a verdict in Bickman's favor.

Plaintiffs argue they suffered prejudice from the denial of their pretrial and trial requests for leave to amend their

17

complaint because they were purportedly "precluded . . . from exercising their rights to produce material evidence, expert witnesses, and fully cross-examine adverse witnesses." We have already concluded the court did not abuse its discretion in denying the pretrial motion. The record demonstrates that there was a single express request to conform the complaint to proof at trial, which plaintiffs made after they rested their case and the jury began deliberations. The court's denial of that request could not have impacted the case plaintiffs were able to present.

## III. The Trial Court Did Not Abuse Its Discretion In Excluding Any Witness

Plaintiffs contend the trial court abused its discretion in excluding the testimony of Angela Cirilli, Dickerson's best friend who is also a doctor, and Lee Dellon, a treating physician.

We review a trial court's exclusion of evidence for abuse of discretion. (*Zhou v. Unisource Worldwide* (2007) 157 Cal.App.4th 1471, 1476.) "[E]ven where evidence is improperly excluded, the error is not reversible unless ' "it is reasonably probable a result more favorable to the appellant would have been reached absent the error. [Citations.]" [Citation.]' [Citations.]" (*Tudor Ranches, Inc. v. State Comp. Ins. Fund* (1998) 65 Cal.App.4th 1422, 1431–1432.)

### A. The trial court did not abuse its discretion by excluding Cirilli's testimony

Plaintiffs' sought to offer Cirilli's testimony "as to her understanding of the circumstances" while Dickerson was in the hospital, based on phone and FaceTime calls she had with Dickerson; "whether or not [Cirilli] believed there was some concealment of the injuries"; what Dickerson's "condition really was"; and how Dickerson's "experience was not, in [Cirilli's]

18

opinion, a normal or reasonable experience." The trial court excluded the testimony because plaintiffs had not disclosed Cirilli as an expert, yet testimony on the issues of concealment, and whether Dickerson's experience was reasonable, would constitute expert testimony. The court also concluded Cirilli's testimony about Dickerson's experiences would be hearsay, since Cirilli was not present at the hospital.

Plaintiffs contend statements Dickerson made to Cirilli about her pain while in the hospital would fall within the "state of mind" hearsay exception under Evidence Code section 1250. They further argue Cirilli's testimony was not hearsay because she was a percipient witness to Dickerson's pain. We disagree.

As a preliminary matter, plaintiffs' attorney neither informed the court that he intended to elicit testimony from Cirilli concerning Dickerson's pain levels while in the hospital, nor argued that Cirilli's testimony was admissible under Evidence Code section 1250. " '[T]o preserve an alleged error for appeal an offer of proof must inform the trial court of the "purpose, and relevance of the excluded evidence . . . ." [Citation.]' " (*People v. Valdez* (2004) 32 Cal.4th 73, 108.) "[W]e cannot hold the trial court abused its discretion in rejecting a claim that was never made." (*Id*. at p. 109.)

Plaintiffs also fail to establish that Cirilli's testimony would be admissible under the "state of mind" hearsay exception. This exception provides that "evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when: [¶] (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at

19

that time or at any other time when it is itself an issue in the action." (Evid. Code, § 1250, subd. (a)(1).) "The exception is limited to out-of-court statements describing a relevant mental state being experienced by the declarant *at the time* the statements were made." (*People v. Whitt* (1990) 51 Cal.3d 620, 642–643 [defendant's statements concerning "events and feelings experienced *before*" prison interview were inadmissible to prove their truth].)

Cirilli testified at her deposition that she could not recall whether she spoke with Dickerson while Dickerson was at the hospital or after Dickerson had returned home. When asked to estimate how many days had passed between the delivery and when she and Dickerson spoke, Cirilli stated only that she did not remember the date. Dickerson's trial testimony indicated that she spoke with Cirilli after she returned home, but not necessarily before. The record does not establish that Dickerson told Cirilli about her pain levels while she was experiencing that pain, as is required for the statements to be admissible under Evidence Code section 1250.

Further, even if Cirilli was a percipient witness to Dickerson's pain, her testimony was cumulative. Cirilli was not the only person who could testify to Dickerson's pain levels at the hospital. Williams testified based on his personal observations about Dickerson's pain levels the day after she gave birth and upon her discharge from the hospital. Dickerson also testified at length about the pain she experienced. The trial court did not abuse its discretion in excluding Cirilli's testimony.

**B.     Plaintiffs agreed not to call Dellon as a witness**

Plaintiffs contend the trial court committed structural error by excluding Lee Dellon's testimony. However, the record

20

establishes that plaintiffs' attorney agreed not to call Dellon as a witness.  The trial court did not err.

Before trial, plaintiffs' counsel stated that he had "what [he] believe[d] to be ten full days of testimony."  The court said it would hold plaintiffs to that estimate.  Witness testimony began on Wednesday, January 18, 2023.  A week later, on January 25, plaintiffs' attorney informed the court that plaintiffs were running behind schedule.  When discussing the remaining witnesses plaintiffs intended to call, the trial court expressed frustration because plaintiffs had identified over 100 experts and changed their minds about who they would call, including Dellon. The court indicated it would decide whether Dellon and others could testify based on whether plaintiffs had time left.

On January 30, plaintiffs' counsel identified two witnesses he expected to call and stated: "We do have another witness, *if necessary*.  We have Lee Dellon."  (Italics added.)  The court informed counsel that plaintiffs were "going way over now." Plaintiffs' counsel responded that plaintiffs would not call Dellon if they did not have time.  The trial court disputed that it had approved Dellon.  Plaintiffs' attorney stated, "That's fine," and that plaintiffs would call the other two witnesses.  The trial court expressed frustration that plaintiffs' attorney came up with new names every time he spoke with his clients.  Plaintiffs' attorney again stated that plaintiffs were "fine" with the other witnesses.

In support of plaintiffs' motion for a new trial, Dickerson submitted a declaration stating that "Dellon would have testified that [her] injuries were specifically caused by the incident during [her] pregnancy when [her] leg was dropped and one leg was left standing and the other flat."  In arguing the motion, plaintiffs' counsel asserted that Dellon was "the only neurosurgeon and

21

treating doctor to testify" and his "testimony concerning causation here was critical."

However, when discussing witnesses with the trial court during trial, plaintiffs' counsel had not argued that Dellon's testimony concerning causation was critical to plaintiffs' case. Rather, he indicated that Dellon's testimony was perhaps unnecessary and ultimately agreed not to call Dellon. The court did not exercise its discretion and therefore did not abuse it.

Even if we assumed the court's statements were tantamount to an order excluding Dellon's testimony, a trial "court may, at any time before or during the trial of an action, limit the number of expert witnesses to be called by any party." (Evid. Code, § 723.) The trial court permitted plaintiffs to call 11 expert witnesses. Plaintiffs do not dispute the trial court's observation that some of those experts opined that the leg drop caused Dickerson's injuries. They also do not contend that Dellon's causation testimony would have differed in any material respect from that of other expert witnesses. Plaintiffs therefore fail to establish that Dellon's testimony was essential to proving causation, or that the exclusion of that testimony would constitute an abuse of discretion or structural error. (*Gordon v. Nissan Motor Co., Ltd.* (2009) 170 Cal.App.4th 1103, 1114.)

Plaintiffs contend several of their witnesses were precluded from relying on Dellon's records in their testimony under *People v. Sanchez* (2016) 63 Cal.4th 665. However, they do not identify a single instance in which the trial court sustained a defense objection to testimony concerning Dellon's records. (*Duarte v. Chino Community Hospital* (1999) 72 Cal.App.4th 849, 856 [argument unsupported by citations to the record may be deemed waived].) Moreover, *Sanchez* provides that testimony is hearsay

22

"[w]hen any expert *relates to the jury* case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion." (*Sanchez*, at p. 686, italics added.) *Sanchez* does not limit what experts may consider when forming their opinions. Indeed, three of plaintiffs' experts testified that they had reviewed Dellon's records.

Finally, plaintiffs fail to demonstrate that additional evidence concerning causation would have altered the outcome here. The jury found that neither Bickman nor the Regents was negligent. It therefore did not reach the issue of whether either party's negligence was the cause of Dickerson's injuries.

## DISPOSITION

The judgment is affirmed.  Defendants shall recover their costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ADAMS, J.

We concur:

EDMON, P. J.

HANASONO, J.